694 A.2d 138

Nathaniel FICK

v.

PERPETUAL TITLE COMPANY et al.

No. 959, Sept. Term, 1996.

Court of Special Appeals of Maryland.

May 28, 1997.

526

---

Nathaniel Fick, Baltimore, for Appellant.

Stanley Alpert (Yvette N. Diamond and Cohen, Alpert and Forman, on the brief, for Appellees, Perpetual and the Bourquins), Baltimore; Edward J. Gilliss (Christine J. Saverda and Royston, Mueller, McLean & Reid, LLP, on the brief, for Appellee Great Western Mortg. Corp.), Towson, for Appellees.

Argued before HOLLANDER, SALMON and THIEME, JJ.

SALMON, Judge.

This case has its provenance in a simple debt collection suit filed by the law firm of Fick & Petty against Jeanette Saint–Bell (Ms. Saint–Bell). That case led to the present one, in which the major legal issue presented is whether, under the Maryland Fraudulent Conveyance Act, the grantee of property who pays fair consideration for the property must be shown to have actual, as opposed to constructive, knowledge of the fraudulent nature of the conveyance in order for a creditor to set aside that conveyance. To understand fully the facts and legal nuances of the interplay between the two cases, it is useful to know the sequence of background events.

## I. THE TIME LINE

1. Commencing in *1989*, the law firm of Fick & Petty represented Ms. Saint–Bell in a successful lawsuit she brought against a third party. As a result of that lawsuit, Ms. Saint–Bell owed Fick & Petty certain legal fees.

2. Fick & Petty, on *June 14, 1991*, sued Ms. Saint–Bell in the Circuit Court for Baltimore County for the aforementioned legal fees ("the debt suit").

3. At the time the debt suit was filed, Ms. Saint–Bell, individually, owned approximately eleven acres of land improved by a home known as 16510 Cedar Grove Road, Sparks, Maryland ("the property"). On *September 11, 1991*, she executed a deed to the property to herself and her minor daughter, Casey Joy Saint–Bell ("Casey Joy"), as joint tenants. The deed recited as consideration: "None (The love and affection that a mother has for her child)."

4. Ms. Saint–Bell and the law firm of Fick & Petty filed, on *December 18, 1991*, in the debt suit, a "Stipulation," which stated, in pertinent part:

5. The plaintiff [Fick & Petty] agrees to accept the sum of Ten Thousand ($10,000.00) Dollars in full satisfaction if paid on or before January 22, 1992. Payment shall be made in cash, certified check, bank check or attorney's

escrow check. Upon payment as provided for in this paragraph, plaintiff shall dismiss its claim with prejudice and tender the original Consent Order for Judgment to defendant's counsel.

6. The defendant expressly consents to the filing of the Consent Order for Judgment on January 23, 1992 if the payment specified in paragraph 5 above is not made prior to 5:00 p.m., January 22, 1992 tendered to the office of counsel for plaintiff.

7. Should the payment as specified in paragraph 5 above not be made as agreed, the defendant may satisfy the Consent Order for Judgment according to the following schedule:

a. pay $11,000.00 until February 22, 1992.

b. pay $12,000.00 from February 23, 1992 until March 22, 1992.

c. pay $13,000.00 from March 23, 1992 until April 22, 1992.

d. pay $14,000.00 from April 23, 1992 until May 22, 1992.

After May 22, 1992, the plaintiff is entitled to execute its judgment and attach such property as it deems necessary, subject to lawful exemption. Post judgment interest at the legal rate shall commence to [accrue] as of May 23, 1992.

5. The day after the Stipulation was signed, on *December 19, 1991*, the deed mentioned in paragraph 3 above, was filed in the land records of Baltimore County.

6. Ms. Saint–Bell did not pay $10,000 as agreed in the Stipulation. Accordingly, on *June 9, 1992*, a consent judgment in the amount of $14,000 was entered in the Circuit Court for Baltimore County in favor of the firm of Fick & Petty against Ms. Saint–Bell.

7. On *April 5, 1993*, Ms. Saint–Bell, individually and on behalf of herself and her minor daughter, Casey Joy, entered into a contract to sell the property to Paul and Donna Bourquin (the "Bourquins") for $263,000.

8. Immediately after the signing of the contract, the Bourquins retained Perpetual Title Company ("Perpetual") to perform a title search on the property to ascertain, *inter alia,* if the property was encumbered by any lien.

9. Based upon advice of Perpetual's agent, Geoffrey Forman, that she would need a court order permitting her to execute a deed conveying Casey Joy's interest in the property, Ms. Saint–Bell retained an attorney who filed a Motion for Authorization of Sale Under Affidavit. The motion was supported by Ms. Saint–Bell's affidavit to the court in which she swore that the reason she conveyed the property to her daughter (as a joint tenant) was because in 1991 she had been "diagnosed as having a serious illness," and she wanted to "facilitate the transfer of [the property] ... in case of [her] demise." She further averred that she was presently "symptom free," but due to lost earnings and medical treatment it was necessary to sell the property. The circuit court, on *April 29, 1993,* signed an order authorizing Ms. Saint–Bell to execute a deed to the Bourquins on behalf of Casey Joy.

10. On *April 30, 1993,* the firm of Fick & Petty filed (in the debt suit) a Writ of Execution against the property.

11. A settlement on the property was held on *May 7, 1993,* and Ms. Saint–Bell, individually and on behalf of her daughter, conveyed the property to the Bourquins at a price of $263,000. Perpetual's agent at the settlement was Geoffrey Forman, an attorney in the law firm of Cohen, Alpert, and Forman. At the settlement, the Bourquins executed a $236,700 note in favor of Great Western Mortgage Corporation (Great Western), secured by a mortgage on the property.

12. Three days after the settlement, on *May 10, 1993,* the sheriff of Baltimore County attempted to carry out the Writ of Execution filed by the law firm of Fick & Petty by posting the property.

13. On *May 13, 1993,* the deed conveying the property to the Bourquins and the deed of trust securing Great Western were filed in the Baltimore County land records.

14. Nathaniel Fick, as an assignee of the law firm of Fick & Petty, filed, on *August 5, 1993,* a lawsuit in the Circuit Court for Baltimore County against Ms. Saint–Bell and the Bourquins requesting, *inter alia,* that the court order the county sheriff to issue a writ of execution against the property to be released only under payment of the amount that was owed by Ms. Saint–Bell to him.

15. Ms. Saint–Bell, on *January 21, 1994,* filed a suggestion of bankruptcy in which she stated that she had filed a petition for bankruptcy in a federal court in Florida.

16. On *October 11, 1994,* Ms. Saint–Bell received a discharge of all her debts, including the debt assigned to Fick, from the bankruptcy court.

## II. THE SECOND AMENDED COMPLAINT

Mr. Fick's initial complaint and an amended complaint against the Bourquins and others were dismissed with leave to amend. On September 6, 1994, Mr. Fick filed a second amended complaint ("the Complaint") in the Circuit Court for Baltimore County.

In Count I of the Complaint, the Bourquins and Great Western were named as defendants. Fick alleged three fraudulent conveyances. The first was from Ms. Saint–Bell to Ms. Saint–Bell and her daughter; the second was from Ms. Saint–Bell and her daughter to the Bourquins; and the third was the mortgage by the Bourquins to Great Western. Fick requested in Count I, *inter alia,* that the court issue a writ of execution on the property.

Count II was a negligence count directed against Perpetual wherein Fick claimed, *inter alia,* that Perpetual owed him (Fick) a duty to search the land records non-negligently and to give his enrolled judgment against Ms. Saint–Bell as well as his "execution and levy" against the property "full force and effect." Count III was a negligence count against the law

firm of Cohen, Alpert and Forman (CAF). Count IV was a negligence count directed at Forman.

Forman, CAF, and Perpetual filed Motions to Dismiss, and on February 2, 1995, after a hearing, the trial court dismissed Counts III and IV, with leave to amend within 20 days. Fick never amended those counts.

In the meantime, on November 17, 1994, Fick voluntarily dismissed the action against Ms. Saint–Bell, although technically she was not named a defendant in the Second Amended Complaint. Summary judgment motions were filed on behalf of Great Western and the Bourquins, and on August 8, 1995, after a hearing, the court granted summary judgment in favor of the movants.

This case went to trial on April 11, 1996, against Perpetual, the only remaining defendant. At the conclusion of Fick's case, the trial judge (Bollinger, J.) determined that Fick had failed to prove negligence and granted Perpetual's motion for judgment.

## QUESTIONS PRESENTED

Appellant presents us with three questions, which we have rephrased:

1. Did the trial judge err in granting summary judgment in favor of the Bourquins and Great Western?

2. Did the trial court err in dismissing Counts III and IV, with leave to amend, against the firm of Cohen, Alpert and Forman (Count III) and Forman (Count IV)?

3. Did the trial court err in granting Perpetual's motion for judgment at the conclusion of plaintiff's case?

## STANDARD OF REVIEW AS TO QUESTION 1

A trial court shall grant a motion for summary judgment "if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law." Md. Rule 2–501(e). Thus, in considering a

motion for summary judgment, the trial court determines issues of law and resolves no disputed issues of fact. *Beatty v. Trailmaster Prods., Inc.*, 330 Md. 726, 737, 625 A.2d 1005 (1993) (citing *Heat & Power Corp. v. Air Prods. & Chems., Inc.*, 320 Md. 584, 591, 578 A.2d 1202 (1990)). In determining whether a party is entitled to judgment under this rule, the court must view the facts, including all reasonable inferences, in the light most favorable to the opposing party. *Baltimore Gas & Elec. Co. v. Lane*, 338 Md. 34, 43, 656 A.2d 307 (1995); *Warner v. German*, 100 Md.App. 512, 516, 642 A.2d 239 (1994). The existence of a question of fact, however, will not necessarily preclude summary judgment unless the resolution of that question will affect the outcome of the case. *King v. Bankerd*, 303 Md. 98, 111, 492 A.2d 608 (1985); *Warner*, 100 Md.App. at 516–17, 642 A.2d 239.

■■■ In order for the opposing party to defeat a motion for summary judgment, the party must show that there is a genuine dispute as to a material fact and support his or her opposition by an affidavit or other sworn pleadings or admissions that set forth facts that would be admissible as evidence. Md. Rule 2–501(b) & (c); *Beatty*, 330 Md. at 737, 625 A.2d 1005. Furthermore, even if the facts are undisputed, if the facts can be interpreted as having more than one permissible inference, the case should be submitted to the trier of fact. The "standard for appellate review of a trial court's grant of a motion for summary judgment is whether the trial court was legally correct." *Heat & Power Corp.*, 320 Md. at 591–92, 578 A.2d 1202.

## RESOLUTION OF QUESTION 1

The law as to fraudulent conveyances is largely founded on the English statute of 13 Elizabeth, enacted in 1570, which provided in substance that all conveyances or dispositions of property, real or personal, made with the intention to defraud creditors, should be null and void as against the creditors. This statute has, in practically all the states, been either recognized as a part of the common law ... or

expressly adopted or reenacted in more or less similar terms.

37 C.J.S. *Fraudulent Conveyances* § 2, at 852 (1943) (footnote omitted).

The English statute was adopted in Maryland, 1 Alexander's British Statutes 499 (Coe's ed. 1912) and remained in effect until 1920, when the Maryland Uniform Fraudulent Conveyance Act (the "Act") was adopted. The Act was derived from the Uniform Fraudulent Conveyance Act, which was approved by the National Conference of Commissioners of Uniform State Laws and the American Bar Association in 1918. Unif. Fraudulent Conveyance Act, 7A U.L.A. 427 (1985 & Supp. 1996). Between 1918 and 1985, the Act was adopted by twenty-five states and the Virgin Islands. *Id.* Although eighteen states have since repealed the Act, a substantial body of case law has developed interpreting its provisions.[1]

■ In Count I, as against the Bourquins and the mortgagor, Great Western, Fick did not ask for money damages. Instead, Count I is based on the Act as set forth in sections 15–201 to 15–212 of the Commercial Law Article of the Maryland Code (1975, 1990 Repl.Vol.). In Count I, Fick asked: 1) that the deed, dated September 11, 1991, from Ms. Saint–Bell to Casey Joy and Ms. Saint–Bell be set aside; 2) that the deed, dated May 7, 1993, from Ms. Saint–Bell and her daughter to the Bourquins be set aside; 3) that the mortgage to Great Western be declared to be subservient to the judgment against Ms. Saint–Bell, which had been assigned to Fick; 4) that the court direct the sheriff to issue a writ of execution against the property and to release it only upon satisfaction of the judgment against Ms. Saint–Bell; and 5) that the court order the sale of the property if the amount owing from Ms. Saint–Bell to plaintiff was not paid within thirty days. Under Maryland law, once a conveyance is proven to be fraudulent, a creditor has the option of either having the conveyance set

---

1. All states that have repealed the Act have replaced it with the Uniform Fraudulent Transfer Act. *See, supra,* 7A U.L.A. 209–11 (1985).

aside or attaching the property conveyed. *Frain v. Perry*, 92 Md.App. 605, 620 n. 7, 609 A.2d 379, *cert. denied*, 328 Md. 237, 614 A.2d 83 (1992).

Sections 15–206 and 15–207 of the Act provide:

### § 15–206. Conveyance by a person about to incur debts.

Every conveyance made and obligation incurred without fair consideration when the person who makes the conveyance or who enters into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors.

### § 15–207. Conveyance made with intent to defraud.

Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud present or future creditors, is fraudulent as to both present and future creditors.

In their motions for summary judgment, the Bourquins and Great Western contended that they were protected by the provisions of section 15–209 of the Act, which say, in pertinent part:

### § 15–209. Rights of creditor whose claim has matured.

(a) *Setting aside conveyance; levy on or garnishment of property conveyed.*—If a conveyance or obligation is fraudulent as to a creditor whose claim has matured, the creditor, as against any person *except a purchaser for fair consideration without knowledge of the fraud at the time of the purchase or one who has derived title immediately or immediately [sic] from such a purchaser,* may:

(1) Have the conveyance set aside or obligation annulled to the extent necessary to satisfy the claim; or

(2) Levy on or garnish the property conveyed as if the conveyance were not made.

(b) *Prior judgment not required.*—In an action to have a conveyance set side or an obligation annulled, it is not

necessary as a condition to the granting of relief that the creditor first obtain judgment on the claim.

(Emphasis supplied.)

The Bourquins assert that they purchased the property for fair value and that the purchase was made without knowledge of the fraud that Ms. Saint–Bell is alleged to have perpetrated and therefore, under section 15–209(a) of the Act, Fick was not entitled to set aside the conveyance or to levy against the property. Great Western, as the holder of a mortgage that conveyed an interest in the property from the Bourquins, claims that section 15–209 also protects it because it is "one who has derived title immediately . . . from such a purchaser" as that phrase is used in section 15–209(a).

Substantively, section 15–209 is quite similar to the proviso in the Statute of Elizabeth, 13 Eliz., ch. 5 (1570) (Eng.), which reads:

> Provided also . . . that this act or anything therein contained, shall not extend to any estate or interest . . . which estate or interest is or shall be upon good consideration and *bona fide* lawfully conveyed or assured to any person or persons, or bodies politic or corporate, not having at the time of such conveyance . . . any matter of notice or knowledge of such covin,[2] fraud, or collusion as is aforesaid.

In Garrard Glenn, 1 *Fraudulent Conveyances and Preferences* § 236, at 497 (rev. ed. 1940), an example is given as to how the British statute operated in a case like the one at hand:

> An insolvent debtor (whom we shall call X) sells to A under such circumstances as to make a fraudulent grantee of A. In such a case, the creditors of X may set aside the transaction and recapture the property from A so long as he still has it. But suppose that before the creditors move against him, A sells the property to B, who has no knowl-

---

**2.** According to *Black's Law Dictionary* 439 (4th ed. 1968), the word "covin" means: "A secret conspiracy or agreement between two or more persons to injure or defraud another."

edge or notice of the circumstances that attended A's original acquisition, and regarded X as merely a predecessor in title. The question is whether the creditors of X may set aside both transfers, from X to A, and from A to B, and thus subject to their debts the property while in the hands of B.

... On the other hand, we are dealing with a rule which is drawn from a statute supplemented by equitable ideas.

Of course, if the statute had affirmatively stated that the ultimate grantee, though he took in good faith and for value, got nothing better than the rights possessed by his transferor, there would be no room for argument. But the original statute, the 13th Elizabeth, never said that. On the contrary, the proviso cuts off the application of the Act to any property which "is upon good consideration and *bona fide* lawfully conveyed or assured to any person or persons," etc., who shall not have "at the time of such conveyance ... any manner of notice or knowledge," etc. By not limiting its protection to the debtor's immediate grantee, the statute leaves room for protection of an ultimate purchaser in good faith.

In order for Fick to prevent the entry of summary judgment against him, he was required to put forth evidence from which a trier of fact could find 1) that the Bourquins did not give fair consideration to the grantors of the property or 2) that at the time the Bourquins bought the property they had knowledge that the grantors were making a fraudulent conveyance of the type mentioned in his Complaint. Mr. Fick never contended that the Bourquins did not give the grantors fair consideration when they purchased the property for $263,-000.

## A. KNOWLEDGE OF THE FRAUDULENT NATURE OF THE TRANSACTION

Must the grantees have actual, as opposed to constructive, knowledge of the fraudulent nature of the conveyance in order to set aside a conveyance as fraudulent under section 15–209?

Most courts that have considered the question have held that constructive notice is sufficient.

While there is authority to the contrary in some jurisdictions, the general rule is that if a purchaser had knowledge of facts and circumstances naturally and justly calculated to excite suspicion in the mind of a person of ordinary prudence, and which would naturally prompt him to pause and inquire before consummating the transaction, and such inquiry would have necessarily led to a discovery of the fact with notice of which he is sought to be charged, he will be considered to be affected with such notice, whether or not he made the inquiry. Under these circumstances it is immaterial that the purchaser did not have actual knowledge of the fraudulent intent of the seller or did not participate therein.

37 C.J.S. *Fraudulent Conveyances* § 126, at 957–58 (1943) (footnotes omitted). To the same effect, *see* 37 Am.Jur.2d *Fraudulent Conveyances* § 9, at 699–700 (1968).

In *Columbia Int'l Corp. v. Perry*, 54 Wash.2d 876, 344 P.2d 509 (1959), the court held that constructive knowledge, not actual knowledge, was all the creditor needed to prove. In that case, one Perry was the majority stockholder in a corporation. Perry was indebted to plaintiff. He sold his corporate stock to one Trosper for $57,000. Thereafter, Perry squandered the sales proceeds. *Id.*, 344 P.2d at 511. Trosper indisputably had no actual knowledge that Perry intended to defraud his creditor, but he was nevertheless sued by plaintiff in an effort to set aside the stock transfer as a fraudulent conveyance. In this context, the *Perry* court set forth the rule:

But the actual knowledge is not always needed. A transferee may be charged with knowledge where he is aware of facts and circumstances which are calculated to put him on inquiry, and such inquiry would have led him to discover the intent of the transferor. *O'Leary v. Duvall*, 10 Wash. 666, 39 P. 163 [ (1895) ]; *Armstrong v. Armstrong*, 100 Wash. 270, 170 P. 587 [ (1918) ]. However, there must be more than mere suspicion to charge the buyer with inquiry and

knowledge of the seller's fraud. There must be discovery of evidential facts leading to a belief in the fraud. *Davison v. Hewitt*, 6 Wash.2d 131, 106 P.2d 733 [ (1940) ].

*Id.*

The same basic rule was adopted in *O'Neill v. Little*, 107 N.J.Super. 426, 258 A.2d 731, 735 (1969), although different terminology was used:

A transfer is not made in good faith if the transferee has knowledge of the fraudulent intent of his grantor or if he is aware of circumstances which should have put him on inquiry and which were equivalent to notice of said fraudulent intent. A leading authority for this proposition is *Tantum v. Green*, 21 N.J.Eq. 364 (E. & A. 1869), where the court stated:

The conclusion to which I have come is the same as that arrived at by the Chancellor, that though Dr. Tantum may not have had such knowledge of the intended fraud as to make his denial thereof perjury, yet he had notice of suspicious, unusual, and extraordinary circumstances, which should have put him on inquiry. That he paid full consideration for the assignments will not suffice. He must not only be a purchaser for value, but a *bona fide* purchaser without notice of the fraudulent intent of the assignor, or of circumstances which should have put him on inquiry, and which were equivalent to notice.

To same effect, *see Equitable Life Assurance Society v. Patzowsky*, 131 N.J.Eq. 49, 23 A.2d 561 (E. & A. 1942).

There is language in some Maryland cases that suggests that Maryland follows the minority rule. *Berger v. Hi–Gear Tire & Auto Supply, Inc.*, 257 Md. 470, 475, 263 A.2d 507 (1970) ("a grantor's fraudulent intent does not vitiate a conveyance unless the grantee participates in the grantor's fraudulent intent"); *Long v. Dixon*, 201 Md. 321, 323, 93 A.2d 758 (1953) (same); *McCauley v. Shockey*, 105 Md. 641, 645, 66 A. 625 (1907). Knowledge of the fraud is equivalent to participation in the fraud. *Oles Envelope Corp. v. Oles*, 193 Md. 79,

89, 65 A.2d 899 (1949). In *Oles,* Judge Delaplaine for the Court said:

> The grantee's knowledge of or participation in the fraud of the grantor must be gathered from the various facts composing the transaction and all the surrounding circumstances. Where a conveyance is valid on its face, the burden of proof is upon the party attacking the conveyance to show either (1) that it was not made upon a good consideration, or (2) that it was made with a fraudulent intent on the part of the grantor to hinder, delay or defraud his creditors, and that this intent was known to or participated in by the grantee. *Fuller v. Brewster [& Co.],* 53 Md. 358, 359 [ (1880) ]; *McCauley v. Shockey,* 105 Md. 641, 66 A. 625 [ (1907) ]; *Kennard v. Elkton Banking & Trust Co.,* 176 Md. 499, 6 A.2d 258 [ (1939) ].

*Id.*

None of the cases mentioned in the last paragraph, however, concerned an allegation by a creditor that a grantee had constructive, as opposed to actual, knowledge of the grantor's fraud.

 Older Maryland cases explicitly hold that constructive knowledge on the part of the grantee is sufficient.

> It is very clear to us that Smith, the father, had ample reason from the facts within his knowledge to believe that his son was perpetrating a fraud on his creditors, and that if his plans were successful he would place the stock of goods and their proceeds beyond their reach. This Court has frequently given its opinion on such a state of facts. In *Baynard v. Norris,* 5 Gill [468], 483 [(Md.1847)] it was said: "In any purchase, if there be *circumstances which in the exercise of common reason and prudence ought to put a man upon particular inquiry, he will be presumed to have made that inquiry, and will be charged with notice of every fact which that inquiry would give him.*" And again, "A purchaser whenever he has sufficient information to put him on inquiry, in equity is considered as having notice; and in such case he will not be deemed a *bona fide* purchaser."

We may also refer to *Green v. Early,* 39 Maryland [223], 229 [(1874)]; *Abrams v. Sheehan,* 40 Maryland, 446, and *Higgins v. Lodge,* 68 Maryland [229], 235 [11 A. 846 (1888)]. Upon this principle we must hold that Smith, the father, was not a *bona fide* purchaser.

*Smith v. Pattison,* 84 Md. 341, 345, 35 A. 963 (1896) (emphasis added). While *Pattison* was decided prior to the Act, the Act itself is declaratory of the common law and of the Statute of Elizabeth, 13 Eliz., ch. 5 (1570) (Eng.). *Damazo v. Wahby,* 269 Md. 252, 256, 305 A.2d 138 (1973). As mentioned earlier, the Statute of Elizabeth protected only grantees who were without "any manner of notice or knowledge of such covin, fraud, or collusion. . . . " *Pattison* has not been explicitly overruled.

We distill from all the above that *Pattison* still enunciates the rule to be here followed, and therefore we first must determine what facts were actually known to the Bourquins at the time they purchased the property. Based on those facts we then determine whether, in the exercise of common sense and prudence, the Bourquins should have been put on inquiry as to Ms. Saint–Bell's alleged fraud. If they should have been put on inquiry, then the law charges them, as grantees, with knowledge of every fact that would have been learned after reasonable inquiry.

Curiously, Fick places prime reliance on the case of *Milholland v. Tiffany,* 64 Md. 455, 2 A. 831 (1886), in his effort to show that the Bourquins had constructive knowledge of the fraud. Based on the *Milholland* case, he argues that knowledge that the deed from Ms. Saint–Bell to herself and Casey Joy was for no consideration was "sufficient to indicate a measure of fraud affecting the conveyance of the property." Fick's reliance on the *Milholland* case is misplaced.

At the time the *Milholland* case was decided, a Maryland statute (article 45, section 1, of the Maryland Code) provided that a conveyance of property from a husband to a wife was not valid if the transfer was "in prejudice of the rights of creditors." *Green v. Early,* 39 Md. 223, 229 (1874). In

*Milholland,* 64 Md. at 457, 2 A. 831, a Mr. Hand transferred land to his wife's name and at the same time paid off an existing mortgage with money borrowed from one Tiffany. Tiffany took back a note, signed by Mr. Hand and his wife, that was secured by a mortgage on the land. Mr. Hand then became insolvent. A lawsuit was filed by the insolvent's trustee to set aside the conveyance to Mrs. Hand as a fraud on creditors. The property was sold by the court, and Tiffany claimed he had a right to the proceeds as a *"bona fide* purchaser, under his mortgage[,] without knowledge that the deed to the wife was fraudulent." *Id.* The non-secured creditors claimed that, although Tiffany did not have actual knowledge of the fraudulent transfer, a "voluntary conveyance to the wife is in itself sufficient knowledge to put the purchaser [Tiffany] upon inquiry, and if he fails or refuses to make the inquiry, he is chargeable with the knowledge of such facts as the inquiry would necessarily have disclosed." *Id.* The court agreed with the creditors and ruled against Tiffany, saying:

And since the decision in *Green v. Early,* 39 Md. 223, this is no longer an open question. In that case it was expressly decided that the purchaser of property thus acquired by the wife under the Code, "was bound to know that the property was liable to the husband's debts, if there was no other sufficient property with which they could be paid; and with this knowledge," say the Court, "he was put upon inquiry as to the existence and extent of the debts for which the property might be liable." We see no reason to qualify in any manner the decision thus made; on the contrary, it is but a just and proper construction of the Code, having regard to the rights of creditors which the Legislature obviously intended to protect.

Conveyances founded upon the consideration of blood or marriage, are, we admit, sanctioned by the law, *and it has been held, that such conveyances are not in themselves sufficient under the Statute of Elizabeth, to put a purchaser upon the inquiry as to their good faith,*—that he has the right to rely upon the presumption that they were honestly made in the absence of evidence to the contrary. But there

is this difference between the *Statute of Elizabeth and our Code: the husband could not under the English Statute nor by the common law convey his property directly to his wife, while under our Code he may do so, provided, however, says the Legislature, that such conveyances are not in fraud of the rights of subsisting creditors.* He could, it is true, convey his property to a trustee for the use and benefit of his wife under the English Statute, but the property in the hands of the trustee was still liable for his debts. And such are the relations between husband and wife, that in dealing with a voluntary conveyance made to the wife under the Code, Courts ought to be watchful to see that they are not mere contrivances to put the property of the husband beyond the reach of his creditors.

*Id.* at 457–58, 2 A. 831 (emphasis added).

■ *Milholland* does not help appellant because there no longer is any counterpart to article 45, section 1, of the Maryland Code, which was the statute under consideration in *Milholland.* Moreover, as the *Milholland* case points out, under the Statute of Elizabeth, the mere fact that the consideration for a conveyance is "blood or marriage" is not in itself sufficient to put a purchaser, such as the Bourquins, upon inquiry.

## B. WHAT THE BOURQUINS KNEW

■ The Bourquins were deposed. Excerpts of their depositions were filed in support of Great Western's motion for summary judgment. Mr. Bourquin testified that at settlement he knew that Ms. Saint–James had three unpaid judgments against her but Mr. Forman advised him that the judgments would not affect the grantors' ability to convey clear title to the property. Mr. Bourquin did not discuss the judgments "in any detail" with Mr. Forman and was not made aware of the nature of the lawsuits that resulted in judgments against Ms.

Saint–Bell.[3]

Mr. Forman, Perpetual's agent, testified in his deposition that he retained Robert C. Raglin to do a title search on the property. Mr. Raglin's title report showed that on September 5, 1991, there was a deed from Ms. Saint–Bell to herself and Casey Joy as joint tenants and that there were three "open" judgments against Ms. Saint–Bell. Mr. Forman said in his deposition that he was aware of the three judgments against the property prior to the May 7, 1993, settlement but that, in his opinion, these judgments did not affect the title to the property.

Mr. Raglin was also deposed. He sent Mr. Forman photocopies of the open judgments. Nothing in the title report shows that the searcher examined the debt suit file or that he was otherwise aware of details in that file such as the date when Ms. Saint–Bell entered into the stipulation with Fick & Petty or the contents of the stipulation.

 In summary, at the time of the May 7, 1993, settlement, all that the Bourquins or their agents actually knew was that Ms. Saint–Bell had open judgments against her and that the conveyance from Ms. Saint–Bell to herself and her daughter as joint tenants was based on blood, i.e., the love a mother has for her daughter. Mere knowledge by a grantee of pre-existing judgments against the grantor does not constitute "knowledge of facts and circumstances naturally and justly calculated to excite suspicion in the mind of a person of ordinary prudence, and which would naturally prompt [the grantee] to pause and inquire about consummating the transaction . . . ." 37 C.J.S. *Fraudulent Conveyances* § 126, at 957 (1943).

 The unpaid judgments did not constitute liens against the property at the time of Raglin's title report because the property was owned by Ms. Saint–Bell and her

---

**3.** Mrs. Bourquin said in her deposition that she did not know of the judgments against Ms. Saint–Bell until after the May 7, 1993, settlement.

daughter as joint tenants. A judgment against one owner does not attach as a lien against real property owned as joint tenants until the sheriff executes against that judgment. *Eastern Shore Bldg. & Loan Corp. v. Bank of Somerset*, 253 Md. 525, 530–31, 253 A.2d 367 (1969). Once the sheriff levies an execution against the property, however, a lien attaches as against the judgment debtor's share of the joint property. *Id.*

Perpetual and its agent, Geoffrey Forman, were not shown by any evidence proffered by appellant in his opposition to the motions for summary judgment to have been negligent in searching the title to the property. Under such circumstances, we know of no authority, and appellant has cited none, that would have required Perpetual or anyone else searching Ms. Saint–Bell's title to inspect the pleadings or other papers in the debt suit filed by Fick & Petty.

The Complaint alleges that the transfer from Ms. Saint–Bell to herself and Casey Joy and later the transfer from Ms. Saint–Bell and Casey Joy to the Bourquins were fraudulent transfers for two separate reasons: 1) that the transfers were made by a person who intends or believes that she will incur debts beyond her ability to pay as they mature (§ 15–206) or 2) the conveyance was made by a person who has the actual intent to hinder, delay or defraud present creditors (§ 15–207). In order to set aside the conveyance to the Bourquins, appellant was obligated to prove that the Bourquins had actual or constructive knowledge that Ms. Saint–Bell harbored the fraudulent intent mentioned in the complaint, i.e., the intent mentioned in sections 15–206 and 15–207 of the Act.

In regard to section 15–206 of the Act, Fick plainly did not prove that there was a material issue of fact as to whether the Bourquins had actual knowledge that Ms. Saint–Bell, at the time of any of the transfers, intended or believed that she would incur debt that was beyond her ability to pay as the debt matured. Moreover, based on the facts actually known to the Bourquins, they were not put on inquiry. *Smith*, 84 Md. 341, 35 A. 963. But even if we assume, *arguendo*, that the Bourquins were put on inquiry, and further

assume that the Bourquins should have carefully inspected the court file dealing with the Fick & Petty debt suit, appellant failed to show what Ms. Saint–Bell's financial status was at the time she made any of the transfers in question. In other words, because we do not know the extent of Ms. Saint–Bell's assets or liabilities at any relevant point in time, we cannot infer what Ms. Saint–Bell intended or believed prior to making any transfer. Even at this late stage we do not know what Ms. Saint–Bell intended, and therefore we cannot say that if the Bourquins had investigated the matter they would have learned of Ms. Saint–Bell's fraudulent intent.

Concerning section 15–207 of the Act, there was no proof that the September 11, 1991, transfer to Casey Joy was "to hinder, delay or defraud creditors." Ms. Saint–Bell's affidavit was unrebutted as to her reason for the transfer. It is worth noting that at any time between the date of Fick & Petty's June 9, 1992, judgment and April 5, 1993, when the Bourquins' contract to purchase was signed, Fick could have executed against Ms. Saint–Bell's joint tenancy interest in the property. Therefore, if Ms. Saint–Bell did intend to hinder or delay Fick, she selected an odd and ineffectual way to do it. Likewise, there was no showing made by Fick that the Bourquins had actual or constructive knowledge that Ms. Saint–Bell's April 5, 1993, sale of the property to them for $263,000 was to "hinder, delay or defraud creditors." Ms. Saint–Bell and her daughter had over $47,000 in equity in the property as of the May 7, 1993, settlement, and the Bourquins were shown to have had no reason to believe that Ms. Saint–Bell would not pay her just debts.

Appellant thus failed to prove that the Bourquins had actual or constructive knowledge of Ms. Saint–Bell's alleged fraudulent intent or that they participated in Ms. Saint–Bell's fraud. The Bourquins, who paid fair value for the property, were therefore protected by the provisions of section 15–209 of the Act. Great Western is likewise protected because it was a grantee who took "immediately" from the Bourquins.

## RESOLUTION OF QUESTION II

As previously mentioned, the trial court dismissed Count III against CAF and Count IV against Forman but gave Fick leave to amend within twenty days. In his brief, Fick overlooked this and incorrectly says that the court, "at the conclusion of the proceedings" (i.e., the April 11, 1996, trial), "rendered a verdict" in favor of CAF, Forman and Perpetual. In the question-presented section of his brief, Fick poses no question as to CAF or Forman, but nevertheless makes the argument: "[A] verdict in favor of the Title Company and . . . [Forman] and Forman's law firm was clearly erroneous." Because appellant misperceived what transpired in the lower court, he did not even bother to brief the issue of whether the trial judge erred in dismissing Counts III and IV.[4]

Assuming the issue is appropriately before us, the trial judge did not err in dismissing those counts. Counts III and IV are based on the premise that Forman, when he checked the title to the property, failed to make note that Fick had a valid lien against the property. Fick alleges that, as a consequence of the valid lien, Forman (and vicariously, CAF) breached his (their) duty to "pay valid liens" prior to releasing the funds to the sellers.

If any valid lien had existed, and if Forman negligently failed to discover it, Forman would have breached no duty owed to Fick. Foreman owed a duty only to Perpetual and the Bourquins because, with exceptions not here applicable, Maryland adheres to the strict privity rule in attorney

---

4. In order for plaintiff to withstand a motion to dismiss for failure to state a claim upon which relief can be granted, pursuant to Md. Rule 2–322(b)(2), the complaint must "allege facts which, if proven, would entitle [the plaintiff] to relief." *Dick v. Mercantile–Safe Deposit & Trust Co.*, 63 Md.App. 270, 273, 492 A.2d 674 (1985) (quoting *Tadjer v. Montgomery County*, 61 Md.App. 492, 502–03, 487 A.2d 658 (1985)). In reviewing the plaintiff's complaint, "we accept as true the well-pleaded factual allegations" and inferences that could reasonably be drawn from those facts. *Id.* at 273, 492 A.2d 674; *Stone v. Chicago Title Ins. Co.*, 330 Md. 329, 333–34, 624 A.2d 496 (1993). The Court, however, need not consider conclusory charges that have no factual support. *Berman v. Karvounis*, 308 Md. 259, 265, 518 A.2d 726 (1987).

malpractice cases. *Flaherty v. Weinberg,* 303 Md. 116, 125, 492 A.2d 618 (1985). Furthermore, even if there was a valid lien as alleged, Fick would not have been harmed by Forman's actions because, by definition, the lien would continue to encumber the land and Fick could thereafter execute on the lien just as if the Bourquins had not gone to settlement.

## RESOLUTION OF QUESTION III

At the conclusion of Fick's case against Perpetual, the trial judge granted judgment in favor of Perpetual. Appellant claims that the trial court erred in granting judgment. His argument has two prongs: 1) Perpetual was negligent in conducting its title search and in failing to discover that Fick had a valid lien against the property as of May 7, 1993, when the Bourquins and Great Western went to settlement and 2) Perpetual owed Fick a duty to conduct a non-negligent title search of the property. We need not reach the second prong, because at trial Fick did not prove that he had a valid lien against the property.

As mentioned earlier, because the property was owned as joint tenants at the time Fick obtained a judgment against Ms. Saint–Bell (in June 1992), no lien attached until Fick executed against the property. Fick, on April 30, 1993, filed a Writ of Execution against the property. But, under Maryland law, filing the writ does not constitute an "execution" of the writ; the writ is considered executed only when it is delivered into the hands of the sheriff. *American Sec. & Trust Co. v. New Amsterdam Casualty Co.,* 246 Md. 36, 40, 227 A.2d 214 (1967). At trial, appellant failed to prove when the writ was received by the sheriff. He only showed that he filed, in the debt suit, a writ of execution on April 30, 1993, and that the sheriff levied against the property three days after the May 7, 1993, settlement. Therefore, appellant failed to prove a valid lien against the property. Absent proof of a valid lien, neither Perpetual nor its agents could possibly have been negligent in conducting the title search.

JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.