609 A.2d 379

**Catherine M. FRAIN**

v.

**Charleen PERRY.**

**No. 1820, Sept. Term, 1991.**

Court of Special Appeals of Maryland.

July 14, 1992.

Patrick R. Hudson, Waldorf, for appellant.

Irwin A. Goldberg, Upper Marlboro, for appellee.

Argued before MOYLAN, ROSALYN B. BELL and DAVIS, JJ.

ROSALYN B. BELL, Judge.

Appellant, Catherine Frain, asks us to set aside a decision of a trial judge in the Circuit Court for Prince George's County, denying her complaint for constructive trust and/or resulting trust against her real property, or a rescission of the deed that she had conveyed to appellee, Charleen Perry, her granddaughter. Frain contends the court erred

—in not imposing a constructive trust against her real property;

—in not imposing a resulting trust against her real property;

—in finding no fraudulent conveyance; and

—in refusing to hear a rebuttal witness.

We see the issues differently.

The real questions presented by the facts in this case are:

(1) Did Mrs. Frain have a confidential/dependent relationship with Ms. Perry?

(2) Did Ms. Perry use that relationship to deprive Mrs. Frain of her property? and

(3) What is the appropriate standard to be used in determining whether the conveyance was fair and just?

We hold that the trial judge never really reached the first two questions. We also hold that the judge applied the wrong standard in reaching his conclusion. In the interest of justice, we remand the case to allow the trial judge to reexamine the parties' relationship and the effect this relationship had on the transfer of the property. We explain.

Catherine Frain is a 79–year–old stroke victim. She also suffers from diabetes and hypertension; she is overweight and has other health problems. Mrs. Frain had her first stroke in 1984. Between 1984 and 1989, she suffered four to five more strokes and was hospitalized intermittently. After one of her hospitalizations, Mrs. Frain gave Ms. Perry

a power of attorney to handle her financial affairs.[1] The power of attorney was executed on February 7, 1989.

During her deposition, Mrs. Frain claimed that Ms. Perry had access to everything she owned. Ms. Perry would come by and pick up her checks and bills in order to deposit the checks and pay the bills. Mrs. Frain also claimed during her deposition that Ms. Perry had handled her affairs for two-and-one-half years prior to 1989, even without the power of attorney.

On March 25, 1989, Mrs. Frain was served with a suit by Montgomery Wards for $683.80, with judgment entered on June 6, 1989. On April 1, 1989, Mrs. Frain was served with a suit by Chase Bank for $2,785.37 and judgment was entered for that amount plus $10 costs on June 2, 1989. On April 17, 1989, a foreign judgment was entered against Mrs. Frain on behalf of Signet Bank for $2,639.28. On May 12, 1989, another foreign judgment was also entered against her by Signet Bank for $2,725.09. Finally, on August 25, 1989 judgment was entered for $9,147, against Mrs. Frain in favor of Sears, Roebuck & Company. No allegations were ever made that anyone other than Mrs. Frain had incurred the debts and was liable for the judgments.

During this time, Mrs. Frain executed the deed to her house on Montrose Street in Upper Marlboro, conveying it to Ms. Perry. Mrs. Frain transferred her interest in the property in fee simple to Ms. Perry, reserving a life estate to herself. No consideration was paid. This transfer took place on April 25, 1989 in the office of attorney Eugene E. Pitrof. It is unclear why the conveyance was made at that time. During her deposition, however, Mrs. Frain testified that Ms. Perry told her that she would not take care of her if she did not sign the property over to her. Mrs. Frain also

---

1. Mrs. Frain has a son, William Frain, although during the relevant time period, she was not in communication with him. Mrs. Frain's daughter, who is the mother of Ms. Perry, is also living; however, she is not involved in the present dispute. Mrs. Frain apparently has other children as well, however, they are also not involved in this suit.

claimed that she went back to the attorney's office the next day to get the deed back, but was unable to see him. In addition, she testified that subsequent efforts to see Pitrof or contact another attorney to help her rescind the deed were fruitless. The deed was recorded on May 25, 1989.

Mrs. Frain was hospitalized on May 24, 1990 until July 30, 1990 when she was transferred directly to Pleasant Living Convalescent Center (PLLC). William Frain, Mrs. Frain's son, testified that he had heard that his mother was residing at PLLC. After being discharged from PLLC at the end of October 1990, Mrs. Frain went to reside with her son and is paying him room and board.

On November 19, 1990, Mrs. Frain filed a complaint against Ms. Perry, seeking to impose a trust and reconveyance of her real property. Mrs. Frain was hospitalized again in December of 1990 for an additional stroke and on January 3, 1991 a deposition was taken at the hospital to preserve her testimony.[2]

A trial on the merits was held in October, 1991. The trial court then rendered its decision, finding in favor of Ms. Perry that there was insufficient proof of actual fraud, and no undue influence or misuse by Ms. Perry of her power of attorney necessitating the establishment of a constructive or resulting trust.

## CONFIDENTIAL RELATIONSHIP

The threshold issue from which everything else flows is whether the parties had a confidential/dependent relationship. During trial, the judge heard a great deal of testimony on the interactions between appellant and appellee. The judge never decided, however, whether a confidential/dependent relationship existed. Since this finding is

---

2. Appellant did not return to her house on Montrose Street after her May 24, 1990 stroke. Ms. Perry contracted with an auction company to sell all of the furniture and possessions in the house so all that is left is the realty. We were told at oral argument that the house is now rented.

essential in determining what the appropriate standard of proof is, we must remand the case for him to enter a finding on that question.

■ The issue of confidential/dependent relationship normally arises in a parent-child situation. In *Treffinger v. Sterling*, 269 Md. 356, 361, 305 A.2d 829 (1972), for example, the Court of Appeals was asked to consider whether a father's conveyance of a choice piece of river front property was made because of the undue influence of one of the children. The Court said:

> "Among the factors to be examined in determining whether this relationship has come into being are the parent's advanced age, his physical debility, his mental feebleness, and his dependence on his child. None of these factors is necessarily conclusive and each should be given that weight which is warranted by the circumstances then present. Normally it is the minor child who relies heavily upon his parent for care and protection or for guidance in business affairs so that a confidential relationship exists between them with the duties running from the adult to the minor. It is only when, as a result of debility or feebleness, a parent becomes dependent on his child for aid and counsel, that a confidential relationship is re-established but with the duties reversed in the latter case and with the burden of establishing the fairness of the transaction case upon the child." (Citations omitted.)

Thus, age, debility and dependence are important considerations. While the instant case does not involve a parent and child relationship, it does warrant similar consideration since the parties' relationship is analogous to that of a parent and child. The trial judge heard a great deal of testimony that pointed toward the formation of such a relationship, but he never concluded that a confidential/dependent relationship existed. While the testimony presented at trial would have led us to conclude that a confidential/dependent relationship did exist, since we are not fact finders, we must remand the case to the trial judge.

The record portrays appellant as a woman who is hindered, both physically and mentally, by a series of strokes. Up until the time of the strokes, appellant had lived by herself and had been fiercely independent and self-reliant. Neighbors testified that during the time they had known her she had kept her own house, cut her own grass, driven a car, and in general, had taken care of her own needs. The neighbors further testified that, although appellee visited appellant prior to the series of strokes, she did so on an infrequent basis. After appellant suffered the strokes, however, things changed. Paul Tabel, one of appellant's neighbors, testified that, during the three to four years after appellant's strokes, she was "dependent" on appellee.

In her deposition, appellant stated that appellee had "pestered the living life out of me to have that deed transferred over to her so she could take care of my financial needs." Appellant further testified that she was

"upset and crying and I was having a real hissy.[3] I really carried on. And then I was so upset about that deed when I go[t] home and thought about it that I decided to get myself back down to that attorney's office and have that deed rescinded."

Appellant was not, however, able to meet with the lawyer again and the deed was not rescinded.[4]

Additional evidence showed that appellee took appellant's telephone out of her home sometime in mid–1989 after she signed the deed and that this made it difficult for her to communicate from her home. This testimony is supported by her then estranged son, William Frain, who testified that he was unable to contact his mother by telephone during this period. He testified that, when he tried calling his

---

3. Webster's Third New International Dictionary (1963) defines "hissy" as: "a fit of temper: Tantrum."

4. Appellant stated in her deposition that she went back to the attorney's office, but was not able to see him. In addition, she testified that she tried to contact other attorneys, but had never gotten to speak with any of them because she "never saw so many busy attorneys in [her] life."

mother in 1989, the home telephone number was changed to an unlisted number and, when he tried again in 1990, the phone company told him it was disconnected. Frain remarked during trial that he thought it was odd that his mother had no telephone because he knew that elderly people relied heavily on telephones for assistance. Frain admitted that he did not try to see his mother at that time because of the break in their relationship.

The judge found that appellee signed appellant into hospitals; installed and removed telephones in appellant's hospital rooms; signed the nursing home admission contract, underlining the no resuscitation provision; and used her power of attorney to pay bills. Staff members at PLLC were consistent in their testimony that appellant complained that her property had been taken from her by appellee and that appellee had forced her to live at PLLC. The nurses at PLLC testified that appellant had only limited access to the telephone and that most of the calls had to be made at the nurses' station or a pay phone. Other witnesses testified that appellee appeared to exert a great deal of control over appellant. Joan O'Sullivan, an attorney with the Senior Law Project division of Legal Aid, who was contacted and met with appellant, testified that her phone conversations with appellant were often interrupted and the phone was removed from appellant's room. A long-term care ombudsman for the Anne Arundel County Department of Aging testified that she met with appellant and made arrangements for O'Sullivan to take on appellant's case. O'Sullivan executed a revocation of the power of attorney for appellant, but was unable to secure the revocation of the deed.

On remand, the trial judge must take another look at the nature of the relationship between appellant and appellee and determine whether a confidential/dependent relationship existed.

## CONSTRUCTIVE TRUST

If the trial judge finds that the parties had a confidential/dependent relationship, the burden shifts to appellee

to prove that appellant's transfer of the deed to appellee was a "free, voluntary and unbiased" act. *See Mattingly v. Mattingly,* 92 Md.App. 248, 607 A.2d 575, 582 (1992). *Mattingly* states:

> " '[If] the party occupying the position of dominion . . . receives a benefit' from the transaction, there is a presumption against its validity, placing upon the beneficiary . . . the burden of establishing by clear and convincing evidence that there has been no abuse of confidence, and that [appellee] 'acted in good faith, and that the act by which [appellee] benefitted was the free, voluntary and independent act of the other party to the relationship.' "

607 A.2d at 582, quoting *Wenger, Admx. v. Rosinsky,* 232 Md. 43, 49, 192 A.2d 82 (1963).

■ In the instant case, appellant asked that a constructive trust be imposed to take back the property that she claims was wrongfully taken by appellee. The remedy of "constructive trust" is an equitable one. Constructive trusts are raised by equity in respect to property which has been acquired by fraud. *Bowie v. Ford,* 269 Md. 111, 118, 304 A.2d 803 (1973); *Wooddy v. Wooddy,* 258 Md. 224, 232–33, 265 A.2d 467 (1970). Constructive trusts are not true trusts in a technical sense, but are imposed by the courts. "Such trusts are 'fraud rectifying' trusts and not 'intent enforcing' ones." *Bowie,* 269 Md. at 119, 304 A.2d 803. If a transferee obtains title to property through his or her own dishonesty or that of another acting for him or her, courts of equity have the power and, indeed, the duty to reach out and regain the property for the benefit of those wronged. *Bowie,* 269 Md. at 119, 304 A.2d 803.

■ In denying appellant's request for a constructive trust on the Montrose Street property, the court found that appellant failed to meet her burden of proving by "clear and convincing" evidence[5] that the property had been obtained

---

5. At one point, the trial judge said in dialogue with counsel, "Count one charges fraud and deceit. You have got a clear and convincing

by appellee through fraud or undue influence. As previously discussed, if the trial judge had found that a confidential/dependent relationship existed between the parties, appellee had the burden to demonstrate that the transfer of the deed was done freely, voluntarily and independently by appellant. Therefore, we must remand the case so the trial court can determine whether to impose a constructive trust on the property. Since appellee has sold all of the furnishings and items in the house, the trust is to be imposed solely on the realty. It is then within the court's discretion to determine whether title is to vest back to appellant or whether a guardianship arrangement may be more appropriate.

## Fraud

If, however, the judge does not find that a confidential/dependent relationship exists between the parties, then his holding, that appellant failed to establish that the transfer of the Montrose Street property was induced by fraud, stands. The Court of Appeals set forth the elements of actionable fraud in *James v. Weisheit*, 279 Md. 41, 44, 367 A.2d 482 (1977). The five essential elements are:

"(1) that a representation made by the [appellee] was false; (2) that its falsity was known to [appellee]; (3) that the misrepresentation was made for the purpose of defrauding the [appellant]; (4) that the [appellant] not only relied upon the misrepresentation, but had the right to do so and would not have done the thing from which the damage resulted if it had not been made; and (5) that the [appellant] suffered damage (meaning injury subject to being redressed by compensatory damages) directly resulting from the respondent's misrepresentation." (Footnote omitted.)

standard." Counsel did not differ with the court. We note, however, that at that point no mention was made of the confidential relationship and its effect on the standard of proof; hence, we do not conclude appellant waived the issue.

In the instant case, the trial judge found that appellant had not met her burden of proving fraud by clear and convincing evidence. He opined:

"Count one which I said, of course, was fraud and deceit, and we all agree required a quantum of evidence of clear and convincing in order to prevail.

\* \* \* \* \* \*

"Now, that deed resulted from a contact that [appellant] herself states that she initiated. She contacted the attorney, she arranged for the deed, she paid cash for the deed.

\* \* \* \* \* \*

"[Appellant] herself stated that she primarily agreed with [appellee] wanting to have the deed made over to her, assuming that [appellee] did want that. [Appellant] stated herself that she primarily agreed with that.

"[One of appellant's attorneys] supposedly discussed the power of attorney with [appellee] and [appellant], according to [appellee's] testimony.

"With respect to the second essential element [appellee] testified that she always produced the power of attorney when that was required, and incidentally, there is no evidence that has been adduced here of [appellee] ever using the power of attorney prior to the incapacitation of [appellant] in this particular case.

"With respect to the third essential element of that particular count, misrepresentation made for purpose of defrauding some other person, the evidence is contrary. [Appellee] has provided a full accounting of whatever it is that she has done.[6]

"Now, with respect to the fourth essential element [reliance on the misrepresentation], there is evidence adduced that would support that.

---

6. Part of appellee's exhibits at trial were handwritten lists of appellant's income and expenses. We have no way of verifying whether this was a "full accounting."

.

"For instance, [appellant] consistently complained while in the nursing home that her property had been stolen. She never deviated from that. But on the other hand, the nursing home records do reflect that, one, the patient was able to advocate for herself, and two, that she was alert and cooperative....

\* \* \* \* \* \*

"Later on, [appellant] executed a power of attorney in favor of her son, William, and that was October 31, 1990.

\* \* \* \* \* \*

"There was also testimony that [appellant] knew that her health was failing and that she wanted a power of attorney for [appellee] to take care of the property and her affairs.

"There is further evidence that is contrary to essential element five, and that is insufficient evidence as to any damage that has been suffered in that particular count."

It is apparent that the trial judge reviewed the record and the testimony, and noted many of the inconsistencies there. We find no error in his conclusion that appellant had failed to prove fraud by clear and convincing evidence.

## RESULTING TRUST

Appellant next argues that the court erred in not imposing a resulting trust with regard to the deed. A resulting trust is

"an implied trust which rests upon the presumed intention of the parties. It may arise when the consideration given for a property is furnished by one party while the legal title is taken by another, provided the circumstances surrounding the transaction do not demonstrate a contrary intention by the parties."

*Levin v. Levin*, 43 Md.App. 380, 387, 405 A.2d 770 (1979); *see also Taylor v. Mercantile–Safe Deposit & Trust Co.*, 269 Md. 531, 539, 307 A.2d 670 (1973); *Fitch v. Double "U" Sales Corp.*, 212 Md. 324, 330, 129 A.2d 93 (1957); *Fasman v. Pottashnick*, 188 Md. 105, 109, 51 A.2d 664 (1947).

 Again, however, since the suit is in equity, the results depend upon the judge's determination of whether there was a confidential/dependent relationship between appellant and appellee. As is the case with a constructive trust, equity courts may act to prevent the transferee from obtaining an interest by declaring a resulting trust. *Levin v. Security Financial Ins. Corp.*, 246 Md. 712, 722, 230 A.2d 93 (1967). If the circumstances surrounding the transfer of property raise an inference, not rebutted by the facts, that the party making the transfer did not intend to give the transferee the beneficial interest in the property, a resulting trust is the appropriate remedy. If, however, no confidential/dependent relationship is found, the party seeking to establish a resulting trust has the burden to do so by clear, unequivocal and convincing evidence. *Levin*, 43 Md. App. at 387, 405 A.2d 770.

In the instant case, appellant argues that appellee breached the trust appellant had placed in her. Appellant contends that, because the deed conveyed to appellee was a "no consideration" deed and that she changed her mind prior to the recordation of the deed, a resulting trust would be an appropriate remedy. Appellee, on the other hand, argues that, if appellant really did return to the attorney's office the next day in an effort to void the transfer, she could have accomplished the same purpose by insisting on a return of the deed to prevent it from being recorded. Appellee also points to the fact that appellant wrote a check to the attorney who had prepared the transfer of the deed.

The trial judge said:

"On to count two, with the standard simply the preponderance of the evidence.

"When we look at [appellee's] conduct it appears from the canceled checks, the ledger sheets and the testimony, that [appellee] acted for the benefit of [appellant]. The bills that were paid were for utilities, the mortgage, and other indebtedness incurred by [appellant].

"There is simply nothing in that particular count that would support [appellant's] case, so the [appellant] fails to prevail on count two."

Thus, we also remand the case for the trial judge to reexamine the resulting trust issue after he resolves the confidential/dependent relationship question and in light of the "clear and convincing" standard.

## FRAUDULENT CONVEYANCE

 Appellant next contends that the court erred in finding that there was no fraudulent conveyance used to defraud appellant's creditors. In a rather creatively fashioned argument, appellant claims that appellee had notice of the creditors' suits, was in charge of handling appellant's financial affairs and property, and took fraudulent steps to avoid those suits by taking appellant to an attorney to have the real property conveyed to protect it from the creditors. Appellant claims she suffered $17,927.56 in damages, which is the total money owed to the creditors who obtained default judgments. Appellant seeks monetary damages in the amount of $17,927.56 against appellee for avoiding the creditors' suits during the time she had the power of attorney.

Appellee argues that she had no knowledge of the creditors' suits prior to the deed transfer because she did not exercise the power of attorney until May of 1990 when appellant had her major stroke and was incapacitated. Appellee contends that it was appellant who had the fraudulent intent to convey the Montrose Street property before it was lost to creditors. Appellee states that appellant suffered no damage from the creditors as a result of the transfer because she incurred the liability as a result of the outstanding debts, not the transfer.[7] The trial judge found that appellant

---

7. The law governing conveyances made to defraud creditors is found in Md.Com.Law II Code Ann. §§ 15–201 through 15–214 (1975, 1990 Repl.Vol.). Section 15–207 provides that a conveyance made with the

"seems to indicate in her deposition that she had knowledge that those accounts were over due. However, she does indicate that she expected [appellee] to pay the bills after executing the power of attorney."

The record does not indicate who actually incurred the large credit card debts. Both sides admit that appellant did not produce any evidence that appellee or someone other than appellant made the charges. Evidence was also presented that appellee was not in charge of appellant's financial affairs until after the judgments were entered. The trial judge was in the best position to judge the evidence placed before him. We find no error in his conclusion that there was no fraudulent conveyance which would necessitate setting the transfer aside.

## THE WITNESS

Finally, appellant contends that the court erred in not allowing Eugene E. Pitrof, the attorney who handled the transfer of the deed, to testify. While we agree that Pitrof's testimony would probably have been helpful to the court in making its decision, appellant did not call Pitrof during trial, but waited until the judge was ready to make his ruling from the bench. Thus, we affirm the judge's decision not to allow Pitrof to testify.

After the defense had rested, the court asked appellant if there was any other evidence that counsel wished to introduce. Counsel replied: "No sir, I think everything is before the Court." The court then stated it would hear closing arguments.

---

intent to defraud present or future creditors is fraudulent as to both present and future creditors. A conveyance without consideration to an immediate family member by a debtor was held to be fraudulent in *Van Royen v. Lacey,* 262 Md. 94, 98, 277 A.2d 13 (1971), *rev'd on other grounds,* 266 Md. 649, 296 A.2d 426 (1972). Once a conveyance is held to be fraudulent, the creditor may either have the conveyance set aside, or may disregard the conveyance and attach or levy execution upon the property conveyed. *Van Royen,* 262 Md. at 101, 277 A.2d 13.

After closing arguments were made, the court asked appellant if there was to be any rebuttal and appellant responded in the negative. The judge then informed both parties that he would set the matter in for a ruling from the bench on October 7, 1991. At the October 7 hearing, appellant's counsel asked for leave of court to call Pitrof as a rebuttal witness. The judge denied counsel's request, clearly informing counsel that the evidence was closed and he was prepared for his ruling.

Since appellant's counsel had rested his case and informed the court he had no rebuttal witnesses after being given at least two opportunities to present one, appellant's argument that the court erred in refusing to hear from Pitrof as a rebuttal witness is without merit.

JUDGMENT VACATED.

CASE REMANDED FOR FURTHER
PROCEEDINGS CONSISTENT WITH
THIS OPINION.

COSTS TO ABIDE THE RESULT.