771 A.2d 1106

**Jay A. BENJAMIN, et al.,**

**v.**

**Nurreddin ERK, et al.**

**No. 2971, Sept. Term, 1999.**

Court of Special Appeals of Maryland.

May 2, 2001.

Edward Smith, Jr. (J. Wyndal Gordon, Russell A. Neverdon, Sr. and The Law Office of J. Wyndal Gordon, P.A., on the brief), Baltimore, for appellants.

Samuel M. Grant (David J. Preller, Jr. and Preller and Preller, on the brief), Towson, for appellees.

Argued before HOLLANDER, ADKINS, and JAMES S. GETTY (Retired, Specially Assigned) JJ.

ADKINS, Judge.

In this dispute over commercial real estate, we consider whether the trial court erred in submitting rescission claims to the jury. A Baltimore City jury rendered a special verdict in favor of Nurreddin Erk, M.D., and Perihan Erk, Inc., appellees, on their complaint against Jay A. Benjamin and Jabco Property Management Services, LLC ("Jabco"), appellants. The jury found that appellees did not agree to sell this property for a grossly discounted price of $250,000, and that appellants conspired and fraudulently induced Dr. Erk to sign a deed and other documents transferring the property to them for that amount. It awarded appellees $30,000 in compensatory damages for rental income they lost after the transfer. The trial judge then set aside the deed based on this verdict, and ordered the property returned to appellees.

Appellants raise a number of issues arising from the unusual way this case was decided by both the jury and the trial

judge.[1] We shall not address all of these questions, however, because we conclude that appellees' equitable claims should not have been submitted to the jury at all, and therefore, that the case must be remanded for a new trial.

## FACTS AND LEGAL PROCEEDINGS

This case revolves around the sale of commercial property located at 6609–6615 Reisterstown Road in Baltimore City (the "property"). There are two buildings on the property, with 25 commercial offices and 130 parking spaces. Erk, a retired medical doctor who conducts some business through Perihan Erk, Inc., purchased the property in 1996 for $1.225 million. In April 1998, Erk offered the property for sale through his long-time friend, real estate broker Rafil Atlas. Pursuant to a six month listing agreement, Atlas listed the property for $1.25 million.

On April 23, 1998, Jay Chopra contracted to purchase the property for $1.7 million. He offered this premium price above the list price on the advice of Jay Benjamin, who suggested the higher price would facilitate financing that Benjamin was trying to arrange for Chopra. After Erk, Atlas, and Chopra obtained legal and accounting advice, however, they agreed to rewrite the contract with a purchase price of $1.2 million, with a financing contingency. The resulting contract was dated April 28, 1998.

Benjamin, however, was not successful in obtaining the necessary financing for Chopra. On June 28, 1998, Erk and Atlas met with Benjamin, who suggested that he might purchase the property himself. On July 20, Benjamin, Erk, and

---

1. Appellants ask us to decide whether (1) the jury's special verdict was irreconcilably inconsistent, (2) the evidence was sufficient to support the jury's finding that appellants committed fraud that induced the transfer, (3) the trial court erred in failing to give an adequacy of consideration instruction and in giving a false representation instruction, (4) the trial court erred in failing to submit appellants' counterclaim to the jury, and (5) the trial court erred in ordering equitable rescission of a deed based on the jury's finding that it had been induced by fraud.

Atlas met at the property. Benjamin agreed to purchase the property for the same $1.2 million price that Chopra had offered. According to Erk and Atlas, he also agreed to make a deposit of $250,000 within one week, even though the Chopra contract specified a deposit of only $200,000. The agreed settlement date was August 1, 1998.

The parties did not prepare a new contract. At Benjamin's suggestion, they simply "overwrote" the April 28, 1998 contract between Chopra and Erk. On that same document, Benjamin inserted the name of his business entity, "Jabco Property Mgmt," over the name Jay Chopra on the line identifying the purchaser. He also wrote "JayB." next to the purchaser line, and signed his initials "JAB" on the line stating that the purchase price was "1,200,000.00." He executed the contract on behalf of Jabco, and dated it 7/20/98.

On July 27 or 28, Erk and Atlas went to Benjamin's office, ostensibly to pick up the $250,000 check. What happened there is disputed.

Benjamin testified that before the meeting, he learned that he would not be able to obtain financing for the $1.2 million deal. He claimed that at this meeting, he informed Erk and Atlas that he could not complete the July 20 contract, but then offered to purchase the property for $250,000 in cash. He admitted, however, that Erk never told him he would accept that offer.

Erk and Atlas testified that when they arrived for the meeting, Benjamin had a $250,000 check for the deposit. Both alleged that Benjamin initially gave the check to Erk, then took it back. They testified that Benjamin told them the check would be delivered and "registered" at the title company as part of the settlement process, and that once the settlement officer had processed it, she would deliver it to Erk.

The settlement officer, Dorinda Hughes, and her title company, Midas Title Company ("Midas"), had an office on the third floor of Benjamin's building. The nature of the relationship between Hughes, Midas, Benjamin, and Jabco was disput-

ed. Erk and Atlas claimed that Hughes and Midas acted as Benjamin's agents, and conspired with Benjamin and Jabco to induce Erk to transfer the property for $250,000. Benjamin and Jabco characterized the relationship as merely involving business referrals and transactions, but no agency, and certainly no conspiracy.

At trial, appellees' theory of the case was that Hughes [2] and Benjamin fraudulently misrepresented that the $250,000 was a mere deposit rather than the full purchase price, and that they conspired to trick the elderly Erk into signing a deed and other documents transferring the property for that amount. Although Benjamin did not settle by the August 1 settlement date in the July 20 contract, Erk and Benjamin had continued to deal with each other. Erk claimed that they extended the contract, but Benjamin disputed that. Erk testified that by late June, he knew he had another buyer at $1 million, and by August 3, Benjamin knew that Erk had another buyer in the event that Benjamin did not complete the deal. Atlas testified that notwithstanding the August 1 settlement date, Benjamin told him he would settle on the property.

On August 8, 1998, Erk and Atlas went to Hughes' office. Their purpose was to discuss settlement-related matters and to obtain the deposit check, as Benjamin had stated. Benjamin was not present. At trial, Atlas and Erk testified that Hughes sent Atlas out of the office while she obtained Erk's signature on documents that changed the purchase price from $1.2 million to $250,000. Hughes asked Atlas to photocopy some gas bills for the property on a machine located on a lower floor of the building. Atlas testified that when he returned,

> Hughes met me in front of door. She took the copies I made, gave ... additional copies. I went back, made the copy, came back, doctor and Mrs. Hughes were talking about other [matters].... [D]octor said to me I signed some papers. I turned to Ms. Hughes and I said what kind of

---

2. A default judgment was entered against Hughes and Midas.

papers he signed? She said ... papers related to title search. And then turned back and started talking.... [I] waited and they talked and then she said okay, deposit.... She said I let you know when you're going to have the deposit[,] and she was, after this conversation ..., going to talk to Mr. Benjamin letting us know when we are going to get the deposit.

Atlas asked for a copy of the papers Erk signed, but Hughes did not give him any copies.

Dr. Erk testified that he signed a number of papers that Hughes put before him, believing that he was signing to obtain his $250,000 deposit. Although he wanted to wait for Atlas to return, Hughes "pushed" him, saying "we have no time."

Three days later, on August 11, Erk and Atlas returned to Hughes' office. Atlas testified that Hughes gave them the $250,000 check, and emphasized that it was a nonrefundable deposit on the $1.2 million contract from July 20. When Atlas asked when settlement would be, she replied it would be in approximately eight to fifteen days.

In the following days, Atlas called Benjamin every other day, asking whether Benjamin's loan package was finalized and when settlement would be. Although Benjamin was busy most times, he did tell Atlas that settlement would be "soon." On August 24, Benjamin finally told Atlas that settlement would be the next day. Erk and Atlas went to Hughes' office. Hughes told them Benjamin would see them at the property.

They went there, and waited three and a half hours for Benjamin. When they asked about settlement, Benjamin initially replied "within ten days." As they walked through the building, however, Erk and Atlas continued to press Benjamin about a settlement date. Finally, Benjamin told them to talk to his "legal representative." When Atlas asked him "[w]hat are you saying?" Benjamin went to his car. Atlas testified that

just before he disappeared from the parking lot, a woman ... walked straight and handed [an] envelope to Dr. Erk and envelope said settlement documents. Doctor said,

"What you mean settlement documents? I didn't settle." She said, "This the documents." Dr. Erk ... just scratched and signed and got the documents, ... and we ... opened up the file and I saw the paper and I said, "Doctor, you sold your property." He said, "No, I didn't." All papers signed. He said, "Well, I signed some papers for this woman but I did not sell [the] property."

Erk denied even discussing selling the property for $250,000, much less agreeing to do so or voluntarily signing any papers doing so. He testified that he did not understand he was signing papers to reduce the price, and that he believed Hughes altered the documents after he signed them.

On or about August 25, 1998, Atlas told Benjamin that Erk wanted to withdraw. Benjamin refused. On August 31, appellees sought a temporary restraining order. Four days later, on September 3, appellees filed an amended verified complaint alleging fraud and conspiracy, and asking for compensatory and punitive damages. The complaint also asked the court for an injunction to prevent appellants "from performing under the Amended Contract," and to prevent them from collecting rents and conveying the property to a third party. The complaint further requested that the transaction be declared null and void, and that "the court restore the [p]laintiffs' legal and equitable title to the aforesaid property." In December 1998, Jabco filed a counter-complaint, alleging that appellees tortiously interfered with its rental contracts with tenants of the property, and that appellees breached their contract assigning those rents to Jabco.

Appellees' claims against appellants went to the jury. The trial judge drafted a special verdict form, reviewed it with counsel, and entertained objections and exceptions. The jury responded as follows:

Was there a valid, enforcible [sic] binding contract between the Plaintiff Seller Nurreddin Erk and/or Perihan Erk, Inc. to sell the subject property ... to the Defendant Buyer Jay A. Benjamin and/or Jabco Property Management for $250,000 that included the three (3) elements of

(a) offer by ... Benjamin
 Yes √ No _____

(b) acceptance by ... Erk
 Yes √ No _____

(c) meeting of the minds
 (mutual assent) by ... Erk and ... Benjamin
 Yes _____ No √

The verdict sheet then set forth a series of questions regarding whether Benjamin, individually or on behalf of Jabco, fraudulently induced the transfer. Although the jury found that Benjamin did not intentionally misrepresent the $250,000 purchase price by concealing it, it concluded that appellees proved by clear and convincing evidence that he did conspire, individually and on behalf of Jabco, to fraudulently induce appellees to enter into the $250,000 contract, and that he committed fraud in inducing appellees into that contract.

Following the instructions on the verdict sheet, the jury then proceeded to award appellees $30,000 in "compensatory damages" for such fraud. This covered "loss of rent." To separate questions asking whether punitive damages should be awarded against Benjamin, Jabco, Hughes, or Midas Title, the jury answered, "no."

The trial judge interpreted the jury's verdict as calling for rescission. He issued a written order declaring the transfer and deed null and void, and ordering that the property "shall revert to its former status" under the deed naming Perihan Erk, Inc. as the grantee. In a separate handwritten order, the court also "[o]rdered ... in light of the jury's verdict rescinding the contract (8/8/98) between the parties, that pending further Order of the Court that the Defendant ... shall not remove any items personalty or otherwise from the subject premises...."

Seeking to avoid the rescission, Benjamin filed a motion for judgment notwithstanding the verdict, or alternatively for a new trial, or to alter and amend the judgment. At the hearing

initially scheduled for that motion, the trial judge advised the parties there was a new decision from this Court that might bear upon their case. He instructed them to review *Merritt v. Craig*, 130 Md.App. 350, 746 A.2d 923, *cert. denied*, 359 Md. 29, 753 A.2d 2 (2000), and to brief him regarding its significance. Appellants argued the rescission order should be vacated because "[t]he teaching of *Merritt v. Craig* [is] . . . that rescission cannot be decided by a jury." After post-trial memoranda and a hearing, the court denied the motion. This appeal followed.

## DISCUSSION

### I.

### The Effect Of Submitting Appellees' Claims To The Jury

Appellants brought this appeal to challenge the trial court's rescission order. They argue that the court had no jurisdiction to order rescission because appellees had elected a legal damages remedy that foreclosed the possibility of rescission. Appellants contend that the effect of appellees' decision to submit their claims against appellants to the jury was to elect purely legal remedies, and, necessarily, to abandon their equitable claim for rescission. Now, they ask us to hold that appellees' sole remedy should have been the jury's $30,000 award for what they contend were "legal damages," and that the trial court had no jurisdiction to "add on" the ultimate equitable remedy—return of the property.

Naturally, with the ownership of this valuable property at stake, appellees disagree. They counter that the jury decided only the factual issues of whether appellants obtained the property by fraudulent means, and if so, the amount of rental income that appellees lost as a result. They argue that based on the jury's factual findings, the trial judge properly exercised his equitable powers to award the appropriate remedy of rescission.

We review the rescission order of the trial court on both the law and the evidence. *See* Md. Rule 8–131(c). We

do not agree with appellants that, as a matter of law, they are entitled to keep the property merely because appellees sought monetary damages. Appellants' argument ignores that restitutionary damages may be awarded in connection with an equitable claim for rescission. "Restitution is 'a party's unilateral unmaking of a contract for a legally sufficient reason,' . . . and it in effect 'restores the parties to their pre-contractual position.' " *Merritt v. Craig,* 130 Md.App. at 366, 746 A.2d 923. Restitutionary damages arising from a fraudulently induced deed are limited to the amount necessary to put plaintiffs back into the same position they were in before the fraudulent transaction. These damages, frequently referred to as "incidental" damages, are equitable rather than legal damages, because a court sitting in equity can award such damages as part of its equitable "clean up powers." *Id.* at 364, 746 A.2d 923. Thus, "damages which are 'restitutionary,' *e.g.,* 'disgorgement of improper profits' or 'incidental to or intertwined with' certain equitable relief, . . . may be equitable." *Mattingly v. Mattingly,* 92 Md.App. 248, 259, 607 A.2d 575 (1992); *see Local No. 391 v. Terry,* 494 U.S. 558, 571, 110 S.Ct. 1339, 1348, 108 L.Ed.2d 519 (1990); *Fink v. Pohlman,* 85 Md.App. 106, 122, 582 A.2d 539 (1990).

In this case, appellees prayed for damages in the amount of the rental income that they allegedly lost after appellants obtained the property by fraud. These lost rent damages are restitutionary or incidental damages, because they represent a disgorgement of improper profits and were intended to restore to appellees the rental income they would have collected if the fraudulent transaction had not occurred. We conclude that the damages prayer appellees took to judgment was purely equitable, and did not in itself make the action "legal."

■ But we do find merit in appellants' complaint regarding the jury's role in this case. Appellants' unsuccessful election of remedies argument is implicitly based on another principle that is fundamental to the resolution of this case-that a jury has no authority to decide an equitable claim of rescission or to award restitutionary damages. As the trial

court recognized at the JNOV hearing, we recently addressed the relationship between equitable claims, election of remedies, and the right to a jury trial in *Merritt v. Craig, supra.* We shall follow *Merritt's* teachings to resolve this appeal.

In *Merritt,* the plaintiffs purchased a home that they later discovered had incurable well water problems. They sued the seller, alleging that she failed to disclose that the property was served by a single well on adjacent property he retained, that she cut the water line to the house in anticipation of the sale, and that she then unsuccessfully tried to reactivate abandoned water sources located on the property. The buyers sued the seller for common law and statutory fraud, praying both for rescission of the deed and for compensatory and punitive damages. After discovery, they moved for a jury trial. The jury awarded the buyers compensatory and punitive damages. Because the buyers still wanted to rescind the transaction, they moved to alter or amend the judgment. The trial court denied the motion, finding that the buyers had abandoned their rescission claim by requesting a jury trial. The buyers appealed, arguing that they never intended to abandon their rescission claim; they took their other claims to the jury because they understood that the trial court would consider their rescission claim after the jury rendered its verdict.

The parties' arguments in *Merritt* resemble the ones now before us, except that in *Merritt,* the parties seeking rescission were the buyers rather than the sellers. The *Merritt* plaintiffs argued that "because fraudulent conduct is common to both the rescission claims ... and the [damages] claim ..., the jury is entitled to hear the case before the court decides the claim for rescission." *Id.* at 357, 746 A.2d 923. The defendant responded that the plaintiffs could not pursue both rescission and damages, and "because they elected to have their claim for damages presented to a jury, they had waived their right to pursue a claim in equity for rescission of the deed and contract." *Id.* at 357–58, 746 A.2d 923.

We held that before submitting their claims to the jury, the plaintiffs "must elect the form of relief, i.e., damages or

rescission, which will dictate whether [they] are entitled to a jury trial or a court trial." *Id.* at 368, 746 A.2d 923. We recognized, however, that the trial judge had led plaintiffs' counsel to believe that no election was necessary. *See id.* Because they "justifiably relied on the court's assurances that it would consider rescission after the legal issues had been presented to the jury," [3] the plaintiffs were entitled to a new trial. *Id.*

■ We find three teachings of *Merritt* applicable to the instant case. First, *Merritt* teaches that not all cases involving claims for both equitable and legal relief are cases involving inexorably intertwined questions of law and equity requiring a jury trial. We emphasized that only in cases where the claim for legal relief is distinctly available *in addition to* a claim for equitable relief is the trial court required to preserve the right to a jury trial.

[T]he equitable claim is solely within the province of the court in the exercise of its equitable jurisdiction.... It is only where the ultimate relief sought is equitable and there are collateral legal issues or a plaintiff is entitled to equitable relief which is compatible with and recoverable in addition to legal relief that the trial court must narrowly exercise its discretion [to] preserv[e] the right to jury trial....

*Id.* at 364–65, 746 A.2d 923.[4]

■ We vacated the jury verdict in *Merritt* on the grounds that the trial court should have required the plaintiffs to

---

**3.** The trial court had acknowledged that it "should have said before we impaneled the jury, this is the decision you must make. Do you want a court trial or a jury trial and allowed you to make that [decision] knowing" the effect of it. *Merritt v. Craig,* 130 Md.App. 350, 367, 746 A.2d 923, *cert. denied,* 359 Md. 29, 753 A.2d 2 (2000) (emphasis omitted). In addition, the court had told plaintiff's counsel that "[t]he court will decide at a later date the matter of rescission, whether that requires a separate hearing or not, certainly, in this hearing." *Id.*

**4.** One example of "inexorably intertwined" claims for legal and equitable relief appears in the Court of Appeals' seminal case discussing the effect of Maryland's merger of law and equity on the constitutionally protected right to a jury trial. In *Higgins v. Barnes,* 310 Md. 532, 530

choose between their equitable claim (rescission) and their alternatively pled legal claim (breach of contract). Writing for the Court, Judge Davis explained that the trial court's promise to consider the rescission claim after the jury returned its verdict revealed its erroneous belief that the case presented questions of both law and equity. This error resulted from the court's failure to distinguish cases involving inexorably intertwined legal and equitable claims from cases involving alternative but mutually exclusive claims for equitable and legal relief. *Merritt* teaches that making this distinction is a critical step in determining whether any party is entitled to a jury trial.

*"[T]he determinative factor on the issue of entitlement to a jury trial is the nature of the relief sought."* ... The error made by the trial court in first observing that "this case has mixed questions, both in equity and law," and then proceeding to submit initially the legal issues to the jury, was that the instant case does not require a selection between the jury and the trial court as the "determiner of

A.2d 724 (1987), a builder sued a homeowner for specific performance of the homeowner's agreement to execute a mortgage in favor of the builder following completion of the home. The homeowner counterclaimed for breach of contract, alleging that the home did not conform to the contract. The Court held that the builder's equitable claim for specific performance and the homeowner's legal counterclaim for breach of contract were inexorably intertwined, such that the homeowner had a right to have his counterclaim decided by the jury before the trial court determined the builder's equitable claim for specific performance. *See id.* at 551–52, 530 A.2d 724.

Another illustration is seen in *Hashem v. Taheri*, 82 Md.App. 269, 571 A.2d 837 (1990). The plaintiff sued a corporation and its officials. He asserted a stockholder's derivative action, traditionally an equitable claim, and legal claims seeking damages on his own behalf. The trial court, sitting without a jury, decided that the plaintiff was a 50% stockholder and enjoined corporate disbursements. We held that was error because the defendants were entitled to a jury trial on the issue of whether the plaintiff was a shareholder. *See id.* at 273–74, 571 A.2d 837. In doing so, we observed that the plaintiff's "success on both the equitable and legal claims depended upon whether the appellee was a stockholder...." *Id.* at 273, 571 A.2d 837. Thus, the claims were inexorably intertwined. The court's improper factual determination of the stock ownership question became the law of the case for the jury, impinging the right to a jury trial. *See id.* at 274, 571 A.2d 837.

common issues" during the trial of the case, but rather a selection between two distinct and mutually exclusive forms of relief, one equitable and one legal, one inherently within the province of the court exercising its equitable jurisdiction and the other to be relegated to a determination by a jury.

*Id.* at 363–64, 746 A.2d 923 (emphasis added) (quoting *Calabi v. Gov't Employees Ins. Co.*, 353 Md. 649, 655–56, 728 A.2d 206 (1999)).

■ Second, *Merritt* illustrates that the presence of a particular factual issue common to both legal and equitable claims, such as fraud, does not in itself require a jury trial. Instead of focusing on the nature of the factual questions at issue, the trial court should focus on the nature of the relief at issue.

[T]he equitable and legal issues presented in the case at hand are on two separate tracks and are controlled only by the nature of the relief sought; thus, this case neither involves inexorably intertwined legal and equitable issues or legal issues merely incidental to the equitable relief sought. Rather, the alternative relief sought *is* itself legal in nature and **the fact that both types of relief are based on a common factual predicate in no way [affects] the legal requirement that ... an initial election as to the type of relief must be made which, in turn, is dispositive of whether appellants are entitled to a jury trial.**

*Id.* at 364, 746 A.2d 923 (emphasis added).

■ Finally, Merritt makes it clear that a fraud claim seeking rescission should not be submitted to a jury at all. **"Rescission is a purely equitable remedy whereby no right to a jury trial exists because a jury is without power or jurisdiction to decide such questions."** *Id.* at 366, 746 A.2d 923 (emphasis added).

■ Clearly, we have some "issues of *Merritt*" in the instant case. Here, we have similar misconceptions about equitable and legal claims arising from common allegations of fraud, about election of remedies, and about submitting claims to the jury. At the outset, appellees alleged a single fraud

scenario involving multiple defendants. Based on these common allegations of fraud, they asserted alternative but mutually exclusive prayers for compensatory plus punitive damages, and for rescission plus restitutionary damages. Although appellants counterclaimed for breach of contract, and appellees asserted claims against other defendants, by the time the case was ready to go to the jury, the only remaining liability issues were appellees' allegations of fraud against appellants.[5] Just before the case went to the jury, appellees elected their remedy for such fraud. At that time, appellees' counsel made it clear that he was pursuing rescission and restitutionary damages (*i.e.*, lost rent), "plus punitives." In response, appellants' counsel properly questioned how appellees could obtain punitive damages along with rescission,[6] and why the jury was deciding the case at all if appellees had elected to pursue rescission. The trial court rebuffed these objections, and proceeded to submit appellees' claims for fraud, lost rent, and punitive damages to the jury, via the special verdict sheet.

That was error. Appellees' fraud claims against appellants should not have been sent to the jury at all. Once appellees elected to pursue rescission, they necessarily abandoned their claims for legal damages, as well as their right to a jury trial on the fraud claims. Electing equitable relief in the form of rescission meant that they were constrained to try their fraud

---

**5.** Appellees obtained default judgments against defendants Hughes and Midas Title. The trial court entered judgment for defendant Atlas, and ruled that it would not submit appellants' breach of contract counterclaim to the jury. As discussed in Part II.D. below, we find no error in the latter rulings. Thus, in contrast to *Higgins*, the jury's role in this case cannot be explained by the presence of appellants' legal counterclaim. *Compare Higgins*, 310 Md. at 547, 530 A.2d 724 ("If an asserted counterclaim presents a legal claim historically accorded the right to a jury trial and raises factual issues in common with the plaintiff's equitable claim, the defendant is ordinarily entitled to a jury determination of those factual legal issues"), *with Impala Platinum, Ltd. v. Impala Sales (USA), Inc.*, 283 Md. 296, 320–21, 389 A.2d 887 (1978) (right to jury trial on legal claims after all equitable claims had been stricken); *Fink v. Pohlman*, 85 Md.App. 106, 121, 582 A.2d 539 (1990) (no right to jury trial on only remaining equitable claim for breach of trust).

**6.** *See infra* at Part II.A.

claims against appellants to the trial judge sitting as a court of equity.

The record shows that neither the trial court nor appellees' counsel understood the effect of this election on appellees' right to a jury trial, or on their right to pursue punitive damages.

Court: [W]hat are you asking for other than rescission and punitive damages? . . .

[Appellants' Counsel]: Where do you get the punitives from? A rescission—that's equitable.

[Appellees' Counsel]: Well, that's why I'm not restricting my case to the count of rescission.

Court: *But, you have to do it at the end of the case. I'm going to ask you what is the relief you're asking.*

[Appellees' Counsel]: And, I'm prepared to give it to you right now, Your Honor. . . . *What I'm asking is . . . the return of the building to my client.*

Court: *That's rescission . . . . The rescission is put the parties back in the same position they were before the exchange of this property occurred.*

[Appellees' Counsel]: Fraud—the fact that he took over the possession of the building through fraud, the rents that he received and punitive damages. That's all I'm asking for. I'm not asking for any damages . . . . that he did to the building. . . . All I'm asking for is that he get his building . . . . back [and] . . . . the rents collected.

Court: What else?

[Appellees' Counsel]: Punitive damages and that's it.

[Appellants' Counsel]: *Can't have it both ways, Your Honor . . . . [E]ither he's going after money judgment or equitable [rescission] . . . . I don't even think the jury can give equitable relief . . . .*

Court: No, I can only give equitable relief. The jury can't. . . .

[Appellants' Counsel]: [H]e's suing for money damages . . . That's what the whole linchpin that this thing was about.

[Appellees' Counsel]: The money damages is the loss of rent.

Just before closing arguments to the jury, appellees' counsel confirmed that they were seeking "return of the property, damages for loss of rent and punitive damages. . . ."

By this time, it should have been clear, as appellants pointed out at the time, that appellees had elected their equitable remedies, and therefore had no right to have the jury decide their claims against appellants, and no right to pursue punitive damages. Despite appellants' objections, the trial court did not recognize that appellees had paired a permissible equitable cause of action (rescission) with both a permissible claim for equitable damages (lost rent) and an impermissible claim for legal damages (punitives). That error caused the next—sending the case to the jury.

■■■ Appellants argue that we should hold appellees to the "should have known" standard mentioned by the trial court in *Merritt,* so that appellees are "stuck" with the jury's award of $30,000 in lost rent damages. Appellants contend that appellees do not deserve the second chance that the plaintiffs got in *Merritt,* because this trial judge did not explicitly promise to consider rescission after the jury's verdict. We disagree.

The record shows that both the judge and appellees tried and submitted the case to the jury on the understanding that the court could grant rescission if and when the jury made a factual finding of fraud. Indeed, that is precisely what happened as soon as the jury delivered its verdict. Moreover, the jury had reason to believe that its answers to the special verdict questions could result in a rescission order by the trial judge. In his closing argument, appellees' attorney emphasized the importance of the jury's role in obtaining rescission, stating that "[t]he verdict sheet is what you'll go in to the jury room with and this is the sheet that really makes the determination as to whether or not Doctor Erk gets his property back. . . ." In these circumstances, as in *Merritt,* we conclude that the plaintiffs justifiably relied on the trial court's state-

ments that it could grant equitable relief after the jury delivered its verdict.

More importantly, we really have no other option than to vacate the judgment entered against the appellants, and remand this case for a new bench trial on appellees' equitable claims against them. Unlike the plaintiffs in *Merritt*, appellees did make an affirmative election of their equitable remedies before the case went to the jury. That election meant that the jury had no legitimate role in deciding appellees' claims against appellants. We cannot affirm the jury's factual findings because, in the absence of any legal claim, the jury had no authority to decide those issues. We cannot affirm the jury's lost rent award because the jury had no authority to award restitutionary damages. We cannot affirm the trial judge's rescission order, because it was explicitly predicated on factual findings by a jury that had no jurisdiction to make them. In sum, we cannot affirm a verdict and remedies rendered by the wrong fact finder.

Although we recognize appellants' timely and legally correct efforts to prevent this from happening, we do not agree that they merit overlooking the fundamental error that occurred here. Given the critical role of the fact finder in evaluating the credibility of these witnesses and in weighing the conflicting evidence, and the trial court's mistaken belief that those were tasks for the jury, we will not remand for a bench decision based solely on the evidence presented at the first trial. A new trial will afford the parties the right to litigate the rescission claim to the correct fact finder. *Cf. Merritt*, 130 Md.App. at 368 n. 5, 746 A.2d 923 ("both parties must be afforded an opportunity to present their respective positions anew *sans* the cloud of a further proceeding beyond" the jury's verdict, *i.e.*, the trial judge's decision regarding rescission).

In reaching our decision, we were not persuaded by appellees' contention that there was no error in sending their claims against appellants to the jury because the case was going to the jury "anyway," in order to adjudicate appellees' claims

against Hughes and Midas. It is true that the question of appellees' right to relief against these co-defendants remained after appellees obtained a default judgment against them. The only matter pertaining to Hughes and Midas that was submitted to the jury, however, was appellees' unsuccessful request for punitive damages.

The absence of any special verdict interrogatories regarding compensatory damages against Hughes and Midas indicates that the court and the parties contemplated rescission as the appropriate remedy for any fraud jointly committed by appellants, Hughes, and Midas. Having elected such equitable relief, appellees abandoned their legal damage claims against Hughes and Midas as well. This is the only result that makes sense, because appellees would not have been able to recover a large damage award against Hughes and Midas, as compensation for the loss of the property, in addition to recovering the property itself. That would be an impermissible double recovery for a single fraudulent scheme executed by joint tortfeasors. Plaintiffs

> may not successfully rescind the contract while simultaneously recovering compensatory and punitive damages. . . . The restoration of the parties to their original position [via rescission] is incompatible with the circumstance when the complaining party is, at once, relieved of all obligations under the contract while simultaneously securing the windfall of compensatory and punitive damages beyond incidental expenses."

*Merritt,* 130 Md.App. at 366, 746 A.2d 923.

Appellees' right to a jury trial on their claims against Hughes and Midas depended on the nature of the relief they sought. Because their election of equitable rescission precluded legal claims for compensatory or punitive damages against any of the participants in the fraudulent scheme, appellees were not entitled to a jury trial on their claims against Hughes and Midas. Thus, contrary to appellees' contention, the case did not "otherwise" have to go to the jury on the fraud claims against Hughes and Midas.

## II.

## Issues On Remand

Appellants raise a number of other issues relating to their appeals from the judgment on appellees' complaint, and from the judgment on their counterclaim. The issues regarding the jury's findings, the jury's verdict, and the court's instructions to the jury are moot given our decision to remand for a new bench trial. For the benefit of the trial court on remand, however, we will briefly address issues that may recur.

### A.

### Punitive Damages

Appellants argue that punitive damages may not be awarded once the plaintiff elects rescission. We agree. Punitive damages cannot be awarded by a court of equity. *See Prucha v. Weiss,* 233 Md. 479, 483–84, 197 A.2d 253 (1964); *St. Luke Evangelical Lutheran Church v. Smith,* 318 Md. 337, 348, 568 A.2d 35 (1990). Moreover, a plaintiff is not entitled to both an equitable and a legal remedy for the same wrongful act. *See Merritt,* 130 Md.App. at 366, 746 A.2d 923.

### B.

### Reasonable Reliance: Duty To Read
### Documents Before Executing

Appellants argue that, as a matter of law, Erk's admission that he did not read the documents stating that the purchase price for the property was $250,000 rather than $1.2 million prevented him from proving reasonable reliance on the alleged fraud. We disagree.

The general rule is that a person who executes a document is legally obligated to read it before executing it. This Court has held that " '[o]ne is under a duty to learn the contents of a contract before signing it; if, in the absence of fraud, duress, undue influence, and the like he fails to do so, he is presumed to know the contents, signs at his peril, suffers

the consequences of his negligence, and is estopped to deny his obligation under the contract.' " *Holzman v. Fiola Blum, Inc.*, 125 Md.App. 602, 629, 726 A.2d 818 (1999) (quoting 17 C.J.S. *Contracts* § 137(b) (1963)).

In this case, whether Erk justifiably failed to read the documents he admittedly signed depends on why he did not do so. From the evidence in the record, a fact finder could reasonably believe (as the jury may have) that Erk did not look for the purchase price on the documents because Hughes led him to believe that the documents were something other than what they were (*i.e.*, documents necessary for later settlement at the $1.2 million sale price), or that the documents said something different than what they said (*i.e.*, $1.2 million sale price). In that case, it may have been reasonable for Erk not to read them closely enough to discern the difference in the purchase price, given Hughes' role as settlement agent. Alternatively, the fact finder might conclude that Hughes or Benjamin altered the documents after Erk signed them. These are disputed factual questions that cannot be resolved as a matter of law.

## C.

### Rescission: Prompt Repudiation Upon Discovery

Appellants contend that appellees failed to promptly repudiate the transaction upon discovery of the fraud, and therefore elected a solely legal damage remedy. They point to appellees' initial complaint, to their prayer for a jury trial, and to their contention that appellees never offered to pay for valuable improvements that appellants made to the building.

 "[W]hen a party to a contract discovers a fraud has been perpetrated upon him, he is put to a prompt election to rescind the contract or to ratify it and claim damages." *Wolin v. Zenith Homes*, 219 Md. 242, 250, 146 A.2d 197 (1959). "Rescission requires at a minimum that the party exercising a right to rescind notify the other party and demonstrate an unconditional willingness to return to the other party both the consideration that was given and any benefits received." *Cut-*

*ler v. Sugarman Org., Ltd.,* 88 Md.App. 567, 578, 596 A.2d 105 (1991). "The right to rescission .... must be exercised within a reasonable time, which is determined, in large part, by whether the period has been long enough to result in prejudice." *Id.*

■ "Maryland decisions which have found that there was a waiver of the right to rescind do so on the basis of an affirmative act of ratification of the contract or some other act which evidences an intent to benefit from the transaction or which renders restoring the parties to their original position impossible or difficult." *Merritt,* 130 Md.App. at 360, 746 A.2d 923. Acts that constitute acceptance, ratification, or estoppel will preclude rescission. *See Wolin,* 219 Md. at 251, 146 A.2d 197.

■ Appellants contend that appellees waived their right to seek rescission, and that it is impossible or difficult to restore the parties to their original position. We find no basis in the record for waiver by acceptance, ratification, or estoppel, and no evidence of prejudice resulting from appellees' pleadings in this case. Within days of discovering the alleged fraud, appellees demanded rescission, asking to withdraw from the transaction. On August 31, 1998, appellees sought injunctive relief. Four days later, they filed an amended complaint specifically requesting rescission. Even assuming that the initial complaint did not clearly assert a rescission claim, we would not find that a four day delay, during which appellants were on notice of appellees' allegations and demands for equitable injunctive relief, constituted waiver. Nor could we conclude that there was any prejudice to appellants, particularly since appellants have never asserted that they suffered any harm as a result of their honest and reasonable belief that appellees would not seek the return of the property.

■ Events during the course of this litigation, however, may preclude a return to the *status quo ante.* Appellants allege that the property should not be returned to appellees because, during the time they held it, appellants encumbered and substantially improved it. Whether such actions were

justifiable in light of appellees' demands for rescission is, again, a question of fact. So, too, is the more difficult question of what effect the encumbrances and improvements should have on any remedy, *e.g.*, whether they make it impossible or difficult to restore the parties to their original position merely by setting aside the deed. In resolving the latter issue, the trial court will be guided by equitable principles applicable to its factual findings.[7]

## D.

### Relitigation Of Appellants' Counterclaims

Appellants argue that the trial court erred in denying their motion for judgment on their breach of contract counterclaim. We find no error in the trial court's denial of appellants' motion for judgment on their breach of contract counterclaim for the $3,817.67 in rent that appellees allegedly collected in violation of the assignment of rents.

---

7. *See, e.g., Creative Dev. Corp. v. Bond*, 34 Md.App. 279, 285, 367 A.2d 566 (1976) (" 'he who seeks equity must do equity' "); *Frain v. Perry*, 92 Md.App. 605, 614, 609 A.2d 379 (1992) ("If a transferee obtains title to property through his or her own dishonesty or that of another acting for him or her, courts of equity have the power and, indeed, the duty to reach out and regain the property for the benefit of those wronged"); *Damazo v. Wahby*, 269 Md. 252, 257, 305 A.2d 138 (1973) (equity "will adapt its relief to the exigencies of the case and will enter a money judgment if this will achieve an equitable result. The form of the relief should be so framed as 'to place the judgment creditor in the same or similar position he held with respect to the fraudulent transferor prior to the fraudulent conveyance' "); *DeShields v. Broadwater*, 338 Md. 422, 441, 659 A.2d 300 (1995) ("when there are competing equities, one of which was acquired prelitigation, it is the pre-existing equity that prevails"); *WinMark Ltd. P'ship v. Miles & Stockbridge*, 345 Md. 614, 628, 693 A.2d 824 (1997) (" 'The clean hands doctrine is not applied for the protection of the parties nor as a punishment to the wrongdoer; rather, the doctrine is intended to protect the courts from having to endorse or reward inequitable conduct' "); *Manown v. Adams*, 89 Md.App. 503, 511, 598 A.2d 821 (1991), *rev'd on other grounds*, 328 Md. 463, 615 A.2d 611 (1992) ("where there is evidence of willful wrongdoing in relation to the controversy before it, the [unclean hands] doctrine allows a court to literally wash its hands of the affair, leaving the guilty party or parties to the consequences of their actions").

In considering the propriety of the trial court's ruling on a motion for directed verdict, this Court, as well as the lower court, is obliged to assume the truth of all evidence tending to sustain the party against whom the motion is directed, as well as all inferences of fact reasonably and fairly deducible therefrom.

*Impala Platinum, Ltd. v. Impala Sales (USA), Inc.*, 283 Md. 296, 329, 389 A.2d 887 (1978). The trial court was obliged to assume the truth of appellees' allegations of fraud, and therefore, to assume that the contract in question was voidable at appellees' option. Appellants were not entitled to judgment in their favor.

■ Appellants alternatively complain that, even if they were not entitled to judgment, they were entitled to present their breach of contract and intentional interference with contractual relations claims to the jury. They contend that the court erred by refusing to submit these claims to the jury. Given our remand for a new bench trial on appellees' equitable claims against appellants, the relevant question is whether appellants also are entitled to relitigate their claims against appellees.

We hold that they are not. We conclude that appellants failed to preserve the record for appellate review of this alleged error. Appellants represent in their brief that the court's ruling that the claims would not be submitted to the jury was made *in camera*. Appellants never objected to that ruling on the record, even when they had an opportunity to do so in connection with the special verdict sheet. *See, e.g., Fowler v. Benton*, 229 Md. 571, 575, 185 A.2d 344 (1962), *cert. denied*, 375 U.S. 845, 84 S.Ct. 98, 11 L.Ed.2d 72 (1963) ("in the absence of some ruling by the court, there is nothing for the [appellate court] to review").

**JUDGMENT IN FAVOR OF APPELLEES ON THEIR COMPLAINT VACATED, AND CASE REMANDED FOR NEW BENCH TRIAL ON APPELLEES' EQUITABLE CLAIMS AGAINST APPELLANTS. JUDGMENT IN FAVOR OF APPELLEES ON APPELLANTS' COUNTER-**

CLAIM AFFIRMED. COSTS TO BE PAID EQUALLY BY APPELLANTS AND APPELLEES.