**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 07-1874**

———————

In Re: MARYLAND PROPERTY ASSOCIATES, INCORPORATED; MARYLAND PROPERTY MANAGEMENT, INCORPORATED; MARYLAND PROPERTY GROUP, INCORPORATED; MARYLAND PROPERTY SYSTEMS, INCORPORATED; MARYLAND PROPERTY SERVICES, INCORPORATED,

Debtors.

-------------------------------------------

CHARLES R. GOLDSTEIN, Trustee,

Plaintiff - Appellee,

v.

COLOMBO BANK, F.S.B.,

Defendant - Appellant.

———————

**No. 08-1251**

———————

In Re: MARYLAND PROPERTY ASSOCIATES, INCORPORATED; MARYLAND PROPERTY MANAGEMENT, INCORPORATED; MARYLAND PROPERTY GROUP, INCORPORATED; MARYLAND PROPERTY SYSTEMS, INCORPORATED; MARYLAND PROPERTY SERVICES, INCORPORATED,

Debtors.

-------------------------------------------

CHARLES R. GOLDSTEIN, Trustee,

Plaintiff - Appellant,

v.

COLOMBO BANK, F.S.B.,

            Defendant - Appellee.

_____

Appeals from the United States District Court for the District of Maryland, at Baltimore.  William D. Quarles, Jr., District Judge.  (1:07-cv-00514-WDQ; AP-00-05578; BK-98-53783-JS)

_____

Argued:  December 3, 2008         Decided:  January 26, 2009

_____

Before WILLIAMS, Chief Judge, and TRAXLER and KING, Circuit Judges.

_____

Affirmed in part and reversed in part by unpublished per curiam opinion.

_____

**ARGUED:** Stephen Warren Nichols, DECKELBAUM, OGENS & RAFTERY, CHARTERED, Bethesda, Maryland, for Appellant/Cross-Appellee. Lisa Bittle Tancredi, VENABLE, L.L.P., Baltimore, Maryland, for Appellee/Cross-Appellant.  **ON BRIEF:** Nelson Deckelbaum, DECKELBAUM, OGENS & RAFTERY, CHARTERED, Bethesda, Maryland, for Appellant/Cross-Appellee.  Abby W. Clifton, VENABLE, L.L.P., Baltimore, Maryland, for Appellee/Cross-Appellant.

_____

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

In this case, a bankruptcy trustee seeks to avoid 24 financial transfers made by the bankruptcy debtors to Colombo Bank, F.S.B. ("the Bank"). The bankruptcy court ruled that the trustee could avoid the transfers and recover the assets from the Bank. The Bank now appeals and the trustee cross-appeals the district court's order affirming in part, reversing in part, and modifying the bankruptcy court order. We affirm in part and reverse in part.

I.

The Bank is a small community savings bank with several offices in Maryland. Monte Greenbaum is a former shareholder and director of the Bank and the sole owner of the following affiliated corporations: The Maryland Property Group, Inc. ("MPG"), Maryland Property Associates, Inc. ("MPA"), Maryland Property Management, Inc. ("MPM"), Maryland Group Management, Inc. ("MGM"), Maryland Property Systems, Inc. ("MPS"), and Maryland Property Services, Inc. ("MPServ") (collectively, "the Debtors"). These corporations were established to manage housing projects that were located in the greater Baltimore, Maryland area and owned by separate limited partnerships ("the Partnerships"). The projects were subsidized by the United States Department of Housing and Urban Development ("HUD").

3

HUD required that the Partnerships maintain tenant security deposits in accounts. From 1993 to 1998, Greenbaum embezzled substantial monies from these accounts and from the projects' operating accounts, moving the funds into his companies and then disbursing them for, among other things, his own personal benefit.

The Partnerships maintained separate operating accounts at several financial institutions, including the Bank. As agent of the Partnerships and owner of the companies managing their properties, Greenbaum controlled all transactions with these institutions. Having used this authority to embezzle the Partnerships' money, Greenbaum also used it to disguise the embezzlement. In this regard, in 1994 he approached Thomas Knowles, the Bank's then-current president, about obtaining loans. Greenbaum proposed that the loans would be secured by the loan proceeds themselves, which the Bank would hold on deposit in the Partnerships' names. Greenbaum also gave Knowles an instruction that Knowles had never received from another customer: the accounts were not to bear interest. When Knowles asked why Greenbaum would want to set up the proposed arrangement, Greenbaum responded that he needed to "establish a reserve," and when Knowles asked how borrowed money could be used to establish reserves, Greenbaum replied simply that he could "establish the reserves that way." J.A. 1394 (internal

4

quotation marks omitted). Knowles questioned Greenbaum no further and undertook no further investigation.

Greenbaum then proceeded to borrow funds in the Partnerships' names ("the share loans"). The proceeds of each loan were deposited with the Bank in the name of the Partnership in whose name the loan was taken out, and the Bank placed a "collateral hold" on each account to secure the loans. J.A. 1499. The existence of these accounts and the funds therein helped Greenbaum conceal the fact that he had raided the Partnerships' other accounts.

Knowles also took several actions that helped Greenbaum conceal the existence of the share loans, and hence Greenbaum's embezzlement. The accounts holding the tenant security deposits — which Greenbaum had raided — needed to be confirmed for HUD and the Debtors' auditor. Customarily, such audit requests originate from a customer's accountant and are returned directly to the accountant, to ensure the veracity of the response. Here, however, Greenbaum himself brought the applicable form to Knowles. Knowles knew that this was highly unusual but nevertheless signed the form.[1] However, he did not complete the

_____

[1] Similar forms in later yearly audits were forged by Greenbaum and not actually signed by any Bank employee.

5

parts asking for a description of any loans relating to the accounts. Nor did he complete the section requesting a description of the collateral for those loans. Moreover, Knowles returned the form to Greenbaum, in contravention of the form's instruction that it should be returned to his accountant. By his actions, Knowles concealed from the auditors and the Partnerships the facts that there were outstanding loans to the Partnerships and that the Bank held security interests in the funds in the accounts.

Knowles also helped conceal the fact that Greenbaum was voluntarily declining interest that otherwise would have accrued on the accounts. When statements were issued that showed interest accruing, Greenbaum contacted Knowles, and Knowles used a word processor to produce dummy statements for Greenbaum that did not show any interest.

Greenbaum used MPA's operating account to make payments on the share loans. And, when Greenbaum determined in July 1997 that the loans had served their purpose, he paid their balances with a $238,751.61 check drawn on MPA's operating account. The funds MPA transferred were commingled funds that had been received from various sources, including a bank in Florida. MPA's payment of the Partnerships' loan obligations extinguished the Bank's security interest in the loan proceeds, leaving them

6

unencumbered in the Partnerships' accounts. In November 1997, the Bank wired the funds to MPA at MPA's request.

In March 1998, the Partnerships filed involuntary bankruptcy petitions against MPA, alleging that it had misappropriated $790,617.95 in funds belonging to the Partnerships. Charles Goldstein ("the Trustee") was appointed Chapter 7 Trustee. He, in turn, filed involuntary bankruptcy petitions on MPA's behalf against MPM, MPG, MGM, MPS, and MPServ. With the Debtors' consent, a bankruptcy court entered Chapter 7 relief orders and ordered that all of the Debtors' cases be jointly administered under MPA's case.

In March 1999, Greenbaum was charged, by way of criminal information, with conspiracy to violate the National Housing Act, see 12 U.S.C.A. 1701, et seq. (West 2001 & Supp. 2008). The information alleged that between January 1993 and March 1998, Greenbaum defrauded the federal government by embezzling funds for his personal benefit from rent escrow accounts when the housing projects were in a "non-surplus cash position," J.A. 765 (internal quotation marks omitted); making false statements, creating false documents, and forging signatures in connection with the HUD-insured properties; fraudulently concealing shortages in these accounts by obtaining loans on the Partnerships' behalf and placing the proceeds in the Partnerships' accounts; failing to report the existence of these

7

loans during audits of the accounts; and misappropriating substantial portions of the security deposits and rent payments. Greenbaum pleaded guilty pursuant to a plea agreement to one count of conspiracy. He was sentenced to 18 months' imprisonment and ordered to pay $900,000 in restitution to HUD.

The Trustee filed the instant complaint against the Bank in the bankruptcy court in March 2000, requesting avoidance of 24 transfers made to the Bank, each of which had been accomplished by checks drawn on MPA, MPG, or MGM's accounts and signed by Greenbaum. The transfers fall into three categories: amounts paid pursuant to the share-loan scheme; amounts paid on loans secured by a second mortgage on a residence of Greenbaum's located in Columbia, Maryland or by a mortgage on a condominium of Greenbaum's located in Ocean City, Maryland; and amounts paid to the Bank for unexplained reasons. Count One sought avoidance of each of the 24 transfers under the Maryland Uniform Fraudulent Conveyance Act and a judgment in the amount of $397,494.77. That amount represented the total amount of the alleged transfers sought to be avoided, less $100,000. One of the transfers sought to be avoided was made by check number 784, which had a face amount of $172,000. The complaint specifically alleged that "$72,000 was for the benefit not of MPA, but of Monte Greenbaum." J.A. 9. Count Two sought avoidance as fraudulent conveyances of those 15 transfers that allegedly

8

occurred within one year before the filing of the involuntary bankruptcy petitions, under section 548 of the Bankruptcy Code, and requested a judgment of $278,768.32. Count Three sought avoidance and recovery of transfers that were made within 90 days of the filing of the involuntary bankruptcy petitions and that constituted preferential transfers, pursuant to Section 547 of the Bankruptcy Code, and requested a judgment of $3,597.62.

Before discussing further the proceedings below, we pause to discuss the applicable statutes. Section 541 of the Bankruptcy Code provides that a bankruptcy estate consists of all "interests of the debtor in property." 11 U.S.C.A. § 541(a) (West 2004). Further, section 548 allows the bankruptcy trustee to avoid certain transfers of such interests. See 11 U.S.C.A. § 548(a) (West 2004). Section 548 and the Maryland Uniform Fraudulent Conveyance Act ("UFCA") both permit avoidance of a transfer if either (1) the transfer was made with the actual intent to hinder, delay, or defraud a creditor (an "actually fraudulent" transfer); or (2) the debtor was insolvent and received less than reasonably equivalent value in exchange (a "constructively fraudulent" transfer). See 11 U.S.C.A. § 548(a) (West 2004); Md. Code Ann., Com. Law §§ 15-204, 15-207 (West 2005). Because the UFCA allows avoidance of transfers that occurred in the three years preceding the bankruptcy petition, see Md. Code Ann, Cts. & Jud. Proc. § 5-101 (West 2006), and the

9

version of the federal statute in effect when the petition in this case was filed allowed avoidance only of transactions occurring within one year prior to the filing of the petition, see 11 U.S.C.A. § 548(a)(1), we will review the bankruptcy court's decisions under the UFCA, as the district court did.

The UFCA provides that a fraudulent conveyance may be set aside, as is relevant here, "against any person except a purchaser for fair consideration without knowledge of the fraud at the time of the purchase." Md. Code Ann., Com. Law § 15-209 (West 2005). Maryland courts, therefore, have held that to set aside a conveyance as actually fraudulent, the party challenging the conveyance must demonstrate that the grantor's fraud was known or participated in by the grantee. See Oles Envelope Corp. v. Oles, 65 A.2d 899, 903 (Md. 1949). Proving a transferee's constructive knowledge of the transferor's fraudulent intent is sufficient in this regard. See Fick v. Perpetual Title Co., 694 A.2d 138, 146 (Md. Ct. Spec. App. 1997). Having set out the applicable legal framework, we now return to a description of the proceedings below, beginning with the trial in bankruptcy court.

During his opening statement, counsel for the Trustee acknowledged that his complaint sought the return of only $72,000 of the $172,000 transfer made by check 784. He explained that when he drafted the complaint, he did not believe

10

he was entitled to recover more. However, the Trustee stated that following discovery and his requests for documents or an explanation of how the Bank applied the funds transferred by this check, he had come to doubt whether the Bank could establish that more than $52,963.88 of the check was applied to debts for which MPA could be liable.[2] Accordingly, the Trustee reserved the right to conform his pleadings to the evidence produced at trial, in the event that the Bank did not offer adequate proof.

The Bank objected, arguing that even the Trustee's pretrial statement, filed two weeks before the trial, did not notify the Bank that the Trustee would seek recovery of this additional amount. The Bank argued that it was not prepared to defend against a claim for such a recovery. The Trustee responded that he had been exchanging documents with the Bank regarding check 784 until the week prior to trial, but that the Trustee had only recently concluded that only $52,963.88 was applied to a loan guaranteed by MPA whereas the Trustee earlier had believed the amount to be $100,000.

Following the close of testimony, the Trustee argued that his complaint as drafted sought avoidance of the entire transfer

---

[2] Documents produced by the Bank indicated that $52,963.88 was applied to a loan that MPA had guaranteed.

11

effected by check 784. He nevertheless moved to amend his complaint to the extent that he needed to do so to seek recovery of $119,036.12 of that transfer. The bankruptcy court granted the motion to amend over a renewed objection by the Bank. In so doing, the court noted that the complaint, even as originally drafted, sought to avoid the entire transfer as a fraudulent conveyance, and therefore would have allowed suit for the entire $172,000.

The bankruptcy court also allowed the Trustee to testify as an expert witness on the issue of the Debtors' insolvency during the relevant time periods, as a forensic expert, and as an expert on fraudulent conveyance issues. The Bank unsuccessfully objected to the testimony on the ground that the Trustee was neither listed as an expert in his initial disclosures pursuant to Bankruptcy Rule 7026(a)(2) nor identified in response to an interrogatory from the Bank seeking the identification of experts.

Following the trial, the bankruptcy court found that the other Debtors were merely alter egos of MPA and that MPA was insolvent at all times from 1995 through the filing of the bankruptcy petition. The court further found that the transfers made during the 90 days prior to the filing of the petition enabled the Bank to receive more than it would have received in bankruptcy had the transfer not been made. Accordingly, the

court determined that those transfers were avoidable as preferences.

The bankruptcy court also found that MPA had made the challenged payments to hinder, delay, or defraud its creditors, and that the Bank knew or should have known of the fraud. Specifically, the court reasoned that the payments were made with the intent to conceal from the Partnerships and HUD that Greenbaum had misappropriated the funds from the escrow accounts. The court found that the amounts transferred did not constitute money stolen or fraudulently taken from the housing project accounts and that even if they did, MPA continued to retain an interest in it. The court also concluded that the funds, even if stolen from the project accounts, were not subject to a constructive trust because they had been commingled with other funds.

The court also determined that the Bank did not apply the funds transferred with check 784 to the share loans. The bankruptcy court found that $52,963.88 of the funds had been applied to a loan that MPA had guaranteed. Although John Lane, the Bank president at the time of trial, had testified that the remaining portion of check 784 — $119,036.12 — was applied to the share loans, the court drew a negative inference against the Bank from the Bank's failure to produce supporting documentary evidence. Thus, the court found that MPA received no fair

13

consideration for $119,036.12 of the transfer effected by check 784.

On this basis, the bankruptcy court entered an order and judgment in favor of the Trustee against the Bank for $444,523.89, plus pre-judgment interest from the date the complaint was filed, with post-judgment interest allowed at the federal rate.

The Bank appealed to the district court, arguing that the bankruptcy court erred in permitting the Trustee to amend his complaint at trial and to testify as an expert witness. The Bank also argued that the court's decision was not supported by the evidence.

The district court ruled that the bankruptcy court did not abuse its discretion in allowing the Trustee to amend his pleadings to conform to the evidence at trial, reasoning that the Bank was on notice at all times that the Trustee was seeking to avoid all transfers made to the Bank within the relevant time period. The court also ruled that the bankruptcy court was within its discretion in allowing the Trustee to testify as an expert. The court noted that the Bank neither disputed the Trustee's qualification to be an expert nor offered evidence that MPA was solvent. The court also concluded that the Trustee knew of MPA's insolvency based on his examination of MPA's books and records and therefore could have testified as a mere fact

14

witness regarding insolvency regardless of whether he testified as an expert. Thus, the court reasoned that any error in the Trustee's admission as an expert was harmless.

Regarding the bankruptcy court's ruling that the transfers made within 90 days before the petition could be avoided as preferences, the district court concluded that the ruling could not be affirmed because the bankruptcy court had not found that the challenged payments were for an obligation of the Debtors'. As for the avoidance of the share-loan payments as fraudulent conveyances, the district court initially ruled that the bankruptcy court erred in failing to credit the Bank for payments that had the effect of discharging the Partnerships' liability to the Bank for the share loans. It therefore initially reversed the bankruptcy court ruling allowing avoidance of payments attributable to the share-loan principal and affirmed as to payments attributable to the share-loan interest.

The court also vacated the bankruptcy court judgment as it related to the non-share-loan payments. The district court concluded that avoidance of these transfers could not be affirmed under an actual-fraud theory because the bankruptcy court had not found that Greenbaum actually intended to defraud the Debtors' creditors with these payments, nor had it found that the Bank knew or should have known of such fraud. The

15

district court also ruled that avoidance could not be affirmed under a constructive-fraud theory because the bankruptcy court had not found that the non-share-loan transfers were made without fair consideration.

The district court therefore affirmed the bankruptcy-court judgment in the amount of the share-loan <u>interest</u> payments, reversed the judgment in the amount of the share-loan <u>principal</u> payments, vacated the remainder, and remanded to the bankruptcy court for further proceedings.

Subsequently, however, the district court granted a request by the Trustee for rehearing. Recognizing that MPA in fact <u>did</u> have creditors besides the Partnerships, and that these other creditors did not directly benefit from the share-loan principal payments, the court concluded that the share-loan payments actually did prejudice other creditors of MPA.[3] Thus, reconsidering its initial ruling, the district court affirmed the bankruptcy court's judgment with respect to the share-loan payments.

The Bank next appealed to this court. We dismissed the appeal on the basis that the bankruptcy court judgment had been

---

[3] The Trustee testified that the total amount of claims against the bankruptcy estate is approximately $1.7 million, $1.2 or $1.3 million of which was claimed by the Partnerships. He testified that the size of the estate would be approximately $1 million.

16

vacated and thus was not a final judgment from which appeal could be taken. See In re Md. Prop. Assocs., Inc., 116 F. App'x 442 (4th Cir. 2004) (per curiam).

On remand, the bankruptcy court determined that each of the challenged transfers was avoidable both as an actually fraudulent conveyance and as a constructively fraudulent conveyance. In support of this conclusion, the court found that MPA, through Greenbaum, intended to defraud MPA's creditors with the non-share-loan payments; that the Bank knew or should have known that the non-share-loan payments were actually fraudulent; and that MPA did not receive fair consideration for the non-share-loan payments.

The bankruptcy court also made more detailed findings regarding the Bank's culpability with respect to the share loans. Whereas in its first opinion the bankruptcy court had found that the Bank merely knew or should have known about Greenbaum's fraudulent share-loan scheme, in its opinion on remand the bankruptcy court found that the Bank actually knew of Greenbaum's fraud and knowingly assisted him in it. The bankruptcy court noted that Knowles "agreed to make unusual loans, sign and deliver official documents in a fraudulent manner[,] and conceal the nature of the share loans by creating misleading interest statements." J.A. 2082. The court also

17

found that Joel Fernebok, who was the Bank's chairman, Knowles's superior, and Greenbaum's friend, knew about the scheme.

The bankruptcy court further found that Greenbaum made the non-share-loan transfers with the intent to hinder, delay, or defraud the Debtors' creditors and that the Bank knew or should have known of that intent. The court noted that the Debtors' insolvency, the lack of consideration for the transfers, the Bank and the Debtors' secrecy and concealment, and their departures from usual business methods all demonstrated Greenbaum's intent. The court determined that the Bank knew of or should have known of Greenbaum's fraudulent intent regarding the non-share-loan payments for several reasons. First, it was aware of Greenbaum's fraud with regard to the share-loan scheme. Second, the checks given to the Bank for Greenbaum's personal obligations did not indicate that they were compensation to Greenbaum for services rendered or otherwise for the benefit of the Debtors. The bankruptcy court determined that these facts put the Bank on constructive notice that Greenbaum was making the transfers to thwart the Debtors' creditors. The court concluded that this notice precluded a finding that the Bank was a good-faith transferee, and the court therefore allowed the Trustee to avoid the payments under a theory of actual fraud.

The bankruptcy court further found that the Debtors had not been obligated to make any payments to the Bank on the loan

18

secured by Greenbaum's Ocean City condominium or the loan secured by his Columbia residence. Because those loans were personal obligations of Greenbaum, the court found that the Debtors received no consideration in exchange for those transfers, and the transfers could therefore be avoided under a constructive-fraud theory as well.

The bankruptcy court also found two other of the transfers — those made with checks 784 and 1254 — could be avoided under this same theory. John Lane, the president of the Bank at the time of trial, had testified that his investigation indicated that $100,000 of the funds transferred with check 784 had been applied to principal and interest on a share loan. The bankruptcy court discredited this testimony because Lane did not have first-hand knowledge and could not produce supporting documentation. Thus, the court could not determine what the funds transferred by check 784 were applied to, and it determined that the Bank failed to prove that the funds were transferred in exchange for fair consideration. The bankruptcy court found that the transfer made with check 1254 was avoidable as well. The court found that the Bank applied those funds to a personal obligation of Greenbaum's rather than to an obligation of MPA's.

For all of these reasons, the court ordered the recovery of $444,523.89 from the Bank.[4]

Again, the Bank appealed the bankruptcy court's decision to the district court, which affirmed in part and reversed in part.

Regarding the share-loan transfers, the district court rejected an assertion by the Bank that the bankruptcy court's finding that the Bank had actual knowledge of Greenbaum's fraudulent intentions regarding the share-loan transfers exceeded the scope of findings authorized by the remand. The court also rejected an argument by the Bank that the bankruptcy court erred in not giving the Bank credit for the loan proceeds it released once the share loans were repaid. In this regard, the district court reasoned that the loan proceeds, held in the Partnerships' names on deposit at the Bank, were the Partnerships' property. The court concluded that the Bank should not receive a credit simply for wiring account holders their funds. The court further noted that the fact the Bank's loans were the original source of these funds was immaterial.

---

[4] This total included certain credits and deductions that are not relevant here.

The bankruptcy court also determined, in contravention of its earlier opinion, that because none of the challenged payments were in payment of any antecedent debt owed by the Debtors, none of the challenged payments could be avoided as preferential transfers.

The district court then turned to the other challenged transfers. The court ruled that avoidance of these transfers could not be affirmed under an actual-fraud theory because the evidence was not sufficient to support the bankruptcy court's finding that MPA made the non-share-loan-related transfers with the actual intent to defraud. Addressing the theory of constructive fraud, the district court ruled that the bankruptcy court had improperly shifted the burden to the Bank to prove that there was fair consideration for those payments. The court concluded, however, that had the bankruptcy court placed the burden on the Trustee to prove there was no fair consideration for all of the non-share-loan payments, a finding that the Trustee met that burden would not have been clearly erroneous with regard to any of the transfers except the one made with check 784. On this basis, the district court affirmed the bankruptcy court's ruling that these payments could be avoided under a constructive-fraud theory. However, the district court reversed the bankruptcy court's ruling that the Trustee could avoid $119,036.12 of the transfer accomplished with check 784, concluding that no evidence would have supported a finding that the Trustee proved that transfer was not made for fair consideration.

21

The Bank now appeals and the Trustee cross-appeals from the district court's decision.[5]

## II.

The Bank contends that the district court erred in affirming the bankruptcy court's ruling allowing the Trustee to avoid the share-loan payments on the basis of fraud. We disagree.

Because the district court "act[ed] in its capacity as a bankruptcy appellate court, we review the bankruptcy court's decision independently." Banks v. Sallie Mae Servicing Corp. (In re Banks), 299 F.3d 296, 300 (4th Cir. 2002). We review the bankruptcy court's factual findings for clear error and its legal conclusions de novo. See Kielisch v. Educ. Credit Mgmt. Corp. (In re Kielisch), 258 F.3d 315, 319 (4th Cir. 2001). "A

_____

[5] In its opinion on remand, the bankruptcy court had ordered payment of 6.2% pre-judgment interest from the date of the complaint and 5.1% post-judgment interest from the date of issuance of the bankruptcy court opinion, January 31, 2007. The district court modified this order to award pre-judgment interest at 6.18% on the portion of the bankruptcy court's judgment that the district court affirmed in the first appeal, post-judgment interest of 1.59% on that same portion from the date of the first bankruptcy court judgment, 6.18% pre-judgment interest on the affirmed portion of the second bankruptcy court judgment up to the date of that judgment, and post-judgment interest of 5.10% on that same portion from the date of the second judgment. The Trustee cross-appeals the district court's modification of the bankruptcy court's interest awards. We find no reversible error and therefore affirm the modification.

finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."  United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948).

A.

The Bank submits that because the sole purpose of fraudulent conveyance law is to restore the transferor's estate to the condition in which it existed prior to the transfer, no cause of action exists for a transfer that caused no prejudice to the estate's creditors.  See, e.g., United States v. Johnston, 245 F. Supp. 433, 440 (W.D. Ark. 1965) (explaining that transfer will not be set aside as fraudulent conveyance if it "does not operate to the prejudice of creditors' rights"). It contends that MPA's use of its funds to repay the principal amount of the share loans caused no prejudice to its creditors because the payments reduced the liability MPA had to the Partnerships, and because the Partnerships benefited from the repayment of their loan obligations.  The Bank also argues that the bankruptcy court erred in failing to give it credit for money that it paid to MPA after MPA paid off the Partnerships' loans.  We disagree with both arguments.

First, even if MPA's payment of the Partnerships' loans did not prejudice the Partnerships, it prejudiced MPA's other

23

creditors. That is so because the claims against MPA's estate exceeded the estate's assets, so that less than 100% of each claim would be paid. Even if MPA reduced its liability to the Partnerships in the very amount that MPA paid off the share-loan principal, those payments allowed the Partnerships to receive 100% payment for that liability. Had those funds remained within MPA's estate, it would have been available to pay the claims arising from that liability at a less than 100% rate, with a balance left over to pay more of the other claims.[6]

---

[6] The Bank argues that the prejudice to non-Partnership creditors cannot be considered because the Trustee did not prove that any non-Partnership creditors existed at the time of the challenged transactions. Because this argument is raised for the first time on appeal, it has been waived. See Muth v. United States, 1 F.3d 246, 250 (4th Cir. 1993). In any event, it is without merit as section 15-207 makes every conveyance effected with the intent to hinder, delay, or defraud "present or future creditors . . . fraudulent as to both present and future creditors." Md. Code Ann., Com. Law § 15-207 (emphasis added).

The Bank also claims that the transfer made with check 1359 — the check that paid off the share loans — did not prejudice MPA's creditors because the transferred funds could not have been subject to claims from MPA's creditors even had those funds not been used to pay off the Partnerships' loans. The Bank argues that the funds were stolen, and thus would have been subject to a constructive trust, which would have put them out of the reach of MPA's creditors. This argument, however, is at odds with an unchallenged finding of the bankruptcy court that the funds could be reached by MPA's creditors because they "came from other sources as well [as the thefts from the Partnerships], including the transfer from [a] bank in Florida where there were no properties being managed by the debtor." J.A. 1247. Since the funds were commingled and could not be traced, the bankruptcy court concluded, no constructive trust
(Continued)

24

Nor do we agree with the Bank that it is entitled to a credit for wiring MPA the funds the Partnerships had on deposit at the Bank. The Bank argues that, by wiring these funds "it in effect gave back the principal portion of check 1359" — the check that paid off the share loans. Brief of Appellant at 31. The Bank contends that the district court was incorrect to characterize that transaction as involving the Partnerships' funds because MPA would have had no obligation to release the wired funds to the Partnerships. It is the Bank's position, however, that is flawed. Once the share loans were paid off in July 1997, the Partnerships owned — free of any security interest — the funds that the Partnerships had borrowed and that were held in their names on deposit at the Bank. The Bank's wiring of the Partnerships' funds to their agent, MPA, did not somehow divest the Partnerships of entitlement to their funds and grant MPA an ownership interest in them. Thus, the Bank's argument that wiring the Partnerships' funds to MPA made MPA whole for MPA's repayment of the share-loan principal — and therefore entitled the Bank to a credit — is incorrect.

_____

could be imposed. Because the Bank does not even acknowledge, let alone challenge, this analysis, there is nothing for us to review concerning this argument.

25

B.

As we have noted, the bankruptcy court found that Greenbaum paid off the share loans to conceal his embezzlement. The Bank challenges this finding, contending that even if Greenbaum's taking out the loans on the Partnerships' behalf was fraudulent, his repayment of them was not. The Bank notes that Greenbaum testified that he was not yet under investigation at the time he decided to pay off the loans. We conclude, however, that the bankruptcy court's finding was not clearly erroneous.

Greenbaum surely knew that if the existence of the share loans were discovered by HUD or the Partnerships, his embezzlement scheme — and MPA's corresponding liability for the embezzlement — might be uncovered. It was therefore reasonable to infer that Greenbaum had MPA pay off the Partnerships' loans so that the loans would not be discovered and so that the embezzlement would remain concealed.

C.

The Bank next argues that regardless of what Greenbaum's state of mind was regarding the repayment of the share loans, the bankruptcy court clearly erred in finding that the Bank knew of Greenbaum's fraudulent intent, as the Bank contends was required to support avoidance of the share-loan payments under an actual-fraud theory. See Berger v. Hi-Gear Tire & Auto Supply, Inc., 263 A.2d 507, 510 (Md. 1970) (holding that

26

grantor's fraudulent intent "will not vitiate or impair a conveyance unless the grantee participates in the fraudulent intent").[7] We hold that proof of the Bank's constructive knowledge of Greenbaum's fraudulent intent was all that was required. Alternatively, we conclude that the finding that the Bank actually knew of Greenbaum's fraud was not clearly erroneous.

1.

The Bank first contends that the district court and the bankruptcy court both erred in concluding that proof of constructive knowledge by the Bank of Greenbaum's fraudulent intent would be sufficient to allow the Trustee to avoid the share-loan transfers under an actual-fraud theory. In essence,

---

[7] The Bank also argues that the bankruptcy court improperly deviated from the district court's mandate in finding on remand that the Bank had actual knowledge of Greenbaum's fraudulent intent regarding the share-loan-related transfers. This argument is curious because the Bank takes the position that such a finding would be necessary to sustain the bankruptcy court's decision. Even if we agreed with the Bank that the bankruptcy court exceeded the district court's mandate in finding that the Bank actually knew of Greenbaum's fraud regarding the share-loan payments, it would serve no purpose to vacate the judgment and then return the case to the bankruptcy court to consider the very factual issue that it had already resolved. In any event, the fact that the Bank actually knew about the share-loan scheme was relevant to the issue of whether the Bank had constructive knowledge of Greenbaum's fraudulent intent regarding the non-share-loan payments, a subject clearly within the scope of the remand.

the Bank maintains that the Maryland Court of Appeals would not follow Fick, on which the lower courts relied.  We disagree.

In Fick, the Maryland Court of Special Appeals confronted the question of whether a grantee of property who gives fair consideration must be shown to have actual, as opposed to constructive, knowledge of the grantor's fraudulent intent in order for a party to successfully set aside the conveyance under the UFCA.  See Fick, 694 A.2d at 140.  The court noted that although some courts have required actual notice by the grantee, most have held that constructive notice is sufficient.  See id. at 145.  The court acknowledged that some language in certain Maryland cases indicated that Maryland followed the minority rule requiring actual knowledge.  See id. at 145-46.  The court did not find those cases dispositive, however, explaining that none "concerned an allegation by a creditor that a grantee had constructive, as opposed to actual, knowledge of the grantor's fraud."  Id. at 146.  And, the court cited older Maryland cases that explicitly held that constructive knowledge by the grantee was sufficient.  See id.  Although the court noted that these cases were decided prior to the UFCA, it explained that the UFCA was declaratory of the common law and of the Statute of Elizabeth.  See id.  Thus, the court found the older cases applicable.  See id.

28

The Bank, relying primarily on the cases _Fick_ explicitly distinguished, argues that the Maryland Court of Appeals would not follow _Fick_. Alternatively, the Bank argues that _Fick_ does not apply in a case in which constructive fraud was not specifically alleged in the complaint. We disagree with both arguments.

When predicting how a state's highest court would decide a legal issue, we view decisions of the state's intermediate appellate court as the best indication, other than decisions of the highest court itself, of how the highest court would rule. See _Private Mort. Inv. Servs. v. Hotel and Club Assocs., Inc._, 296 F.3d 308, 312 (4th Cir. 2002). It is undisputed that the cases on which the Bank relies for support were, unlike _Fick_, cases in which a theory of constructive knowledge was not asserted. The significance of that point is not that _Fick_ decided that constructive knowledge must be pleaded explicitly in order to charge the grantee with knowledge under that theory. Rather, it is that language in those other cases stating the requirement that a grantee know of a grantor's fraud should not be read to exclude the possibility that the grantee would be _charged with_ such knowledge because he was on inquiry notice.

2.

Even if the Trustee were required to prove that the Bank had actual knowledge of Greenbaum's fraudulent intent regarding

29

the share-loan payments, we conclude that the bankruptcy court's finding of such knowledge was not clearly erroneous. Greenbaum's prior relationship with the Bank, Knowles's failure to make any significant investigation despite the obviously unusual nature of the share loans, his participation in creating misleading audit documents, and his production of dummy account statements, taken together, are powerful evidence that the Bank was aware of the share-loan scheme. The Bank concedes that this evidence "might support a finding that Knowles knowingly participated in the share loan scheme" were it not for other facts that the Bank argues the bankruptcy court did not explicitly consider. Brief of Appellant, at 44. In particular, the Bank points out that Knowles and Greenbaum had not known each other prior to the making of these loans; Knowles and Greenbaum both testified that no Bank employee knew about Greenbaum's scheme; there was no evidence presented that any bribes were paid to anyone connected with the Bank or that the Bank or Knowles profited from the share loans other than the interest that they generated; bank examiners concluded there was nothing illegal about the loans; neither Knowles nor any Bank employee was charged with any crime related to the share loans; and although Knowles signed some of the account confirmations early in the scheme, Greenbaum later forged Knowles' signature on some account confirmations.

In the end, the Bank argues that the only reasonable inference to be drawn from the evidence as a whole was that Knowles was not actually aware of Greenbaum's scheme, but merely "incredibly stupid." Id. at 44. We do not agree that the evidence compelled that conclusion. The lack of evidence of any financial motive on the part of anyone at the Bank to help Greenbaum execute his fraud and the lack of evidence of any previous relationship between Greenbaum and Knowles might have been more persuasive in the absence of the evidence that Greenbaum was a former director and shareholder of the Bank. That relationship certainly raised the possibility that Bank employees might be sympathetic, or might be urged by their superiors to be sympathetic, to assisting Greenbaum in his fraudulent activities. And, the fact that various government entities did not bring criminal proceedings against Bank employees does not excuse the bankruptcy court from deciding for itself, by a preponderance of the evidence, whether the Bank was aware of Greenbaum's fraudulent scheme. Finally, it is hard to see the relevance of the fact that Greenbaum forged Knowles's signature on some account confirmations, in light of the fact that Knowles willingly signed others. We therefore conclude that the bankruptcy court's finding that the Bank had actual knowledge of Greenbaum's fraudulent intent was not clearly erroneous.

In sum, for all of the reasons discussed, we hold that the district court properly affirmed the bankruptcy court's ruling allowing the Trustee to avoid and recover the share-loan payments.

## III.

The Bank also contends that the bankruptcy court abused its discretion by permitting the Trustee to testify as an expert witness in the areas of fraud examination, fraud transfer analysis, and solvency analysis, given that the Bank had no notice prior to trial that he might be testifying as an expert in those areas. The Bank argues that without this expert testimony, the Trustee would have been unable to establish MPA's insolvency, and any attempt by the Trustee to avoid and recover the non-share loan payments under a constructive-fraud theory would have failed. We find no abuse of discretion.

Bankruptcy Procedure Rule 7037, which provides that Rule 37 of the Federal Rules of Civil Procedure applies in adversary proceedings, see Fed. R. Bankr. P. 7037, requires the exclusion of any witness not disclosed as required by Rule 26 of the Federal Rules of Civil Procedure unless the failure to disclose is "substantially justifi[ed]" or "harmless," Fed. R. Civ. P.

32

37(c)(1).[8] Although the Bank argues that the failure to disclose cannot be considered harmless because the expert testimony helped the Trustee's case and harmed the Bank's, that argument is misplaced. The critical inquiry under Rule 7037 concerns the prejudicial effect of the Trustee's failure to disclose that he might be providing the expert testimony, not of the testimony itself, and the Bank offers no argument regarding how timely disclosure would have made any difference.

IV.

On cross-appeal, the Trustee argues that the district court erred in reversing the bankruptcy court's ruling allowing the Trustee to avoid and recover $119,036.12 of the transfer made with check 784. We agree.

The bankruptcy court found that the evidence did not establish how the Bank applied $119,036.12 of the funds transferred by that check, and thus the court found that MPA did not receive fair consideration for it. The president of the Bank at the time of trial, John Lane, testified that his investigation had indicated that $119,036.12 of the funds had

_____

[8] Bankruptcy Procedure Rule 7026 provides that Rule 26 of the Federal Rules of Civil Procedure applies in adversary proceedings. See Fed. Bankr. Rule 7026.

been applied to share loans.[9]  The bankruptcy court discredited this testimony because Lane did not have first-hand knowledge and could not produce supporting documentation.  The court also inferred from the fact that the Bank did not produce the records that MPA did not receive fair consideration for $119,036.12 of the transfer.[10]

The district court ruled that the bankruptcy court erred in shifting the burden to the Bank to prove that MPA received fair consideration for the transfer.  The district court ruled that, had the bankruptcy court realized that the Trustee bore the burden, it could only have found that the Trustee failed to meet his burden with regard to check number 784.  The district court therefore reversed the bankruptcy court decision to the extent it allowed the Trustee to avoid and recover $119,036.12 of the payment.  The Trustee argues that the district court erred regarding the constructive-fraud theory.[11]

---

[9]  Of course, had the bankruptcy court credited Lane's testimony that the funds had been applied to the share loans, the court would have ruled that the transfer could be avoided.

[10]  The court inferred that $119,036.12 of the transfer was "part of the fraudulent scheme in which [the Bank] participated with Greenbaum."  J.A. 2112.

[11]  Because we conclude that the bankruptcy court's ruling should have been affirmed under a constructive-fraud theory, we do not address the viability of the Trustee's actual-fraud theory.

The Trustee argues that the district court erred in concluding that the bankruptcy court improperly shifted the burden of proof to the Bank regarding this transfer. We agree.

A party seeking to set aside a conveyance as fraudulent initially bears the burden of proving the fraud. See Sullivan v. Dixon, 373 A.2d 1245, 1248 (Md. 1977). "It is well established . . . that facts and circumstances may be such as to shift the burden to the grantee to establish the bona fides of the transaction." Berger, 263 A.2d at 510. The presence of several badges of fraud are "facts and circumstances" sufficient to shift the burden regarding consideration. See Wellcraft Marine Corp. v. Roeder, 550 A.2d 377, 379 (Md. 1988) (internal quotation marks omitted). Such badges can include, inter alia, the grantor's insolvency, the relationship between the grantor and the grantee, and departure from the normal course of business. See id.

Here, the relationship between Greenbaum and the Bank bears special attention not only because Greenbaum was a former director and stockholder, but also because the two were already engaged in fraudulent activities regarding the share loans that represented a departure from the Bank's normal course of business. In light of this relationship and MPA's insolvency, the bankruptcy court's decision to shift the burden to the Bank

35

to show that MPA received fair consideration for check 784 was well founded.

## B.

The Bank maintains that even if the transfer made by check 784 was otherwise avoidable, the bankruptcy court abused its discretion in allowing the Trustee to amend his complaint to seek recovery of more than $72,000 of that transfer. We disagree.

Federal Rule of Bankruptcy Procedure 7015, providing that Rule 15 of the Federal Rules of Civil Procedure applies in adversary proceedings, see Fed. R. Bankr. P. 15, allows pleadings to be amended with leave of the court, see Fed. R. Civ. P. 15(a). Leave to amend "shall be freely given when justice so requires." Id. We review the grant of a motion to amend the pleadings for abuse of discretion. See Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc., 43 F.3d 922, 940 (4th Cir. 1995). We find no abuse of discretion here.

Counsel for the Trustee represented to the bankruptcy court that the parties had been exchanging documents regarding check 784 until the week before trial and that the Trustee had only recently determined that he was entitled to recover more than $72,000 of the transfer. As the Bank did not dispute counsel's account, the bankruptcy court had no reason to believe that the

Trustee had delayed unreasonably in notifying the Bank that he was seeking recovery of a greater amount.

Furthermore, the Bank did not demonstrate to the bankruptcy court how it would be prejudiced by the "late" amendment. Whether the Trustee was seeking recovery of $72,000 or $119,036.12 of the $172,000 transfer, the Bank had reason to show that it had given MPA more than the $52,963.88 worth of consideration that it could prove. As it failed even to prove consideration valued at $72,000, there is no reason to believe that its evidence would have been any different had the initial complaint sought recovery of the additional $47,036.12.

V.

In sum, we reverse the district court's reversal of the bankruptcy court's ruling that the Trustee could avoid and recover the challenged portion of the transfer accomplished by check number 784. Otherwise, we affirm.

AFFIRMED IN PART AND REVERSED IN PART

37